James C. SHINDLER, et al., Appellants,

v.

H.B. HARRIS, Jr., Appellee.

No. 01–83–0110–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

April 12, 1984.
Rehearing Denied May 24, 1984.

Joe H. Reynolds, Thomas D. Cordell, Ann Ryan Robertson, Reynolds, Allen & Cook, William K. Wilde, Marc D. Murr, Bracewell & Patterson, Brantley Harris, Houston, for appellants.

Ronald E. Tigner, Childs, Fortenbach, Beck & Guyton, Levert J. Able, Tom F. Coleman, Able & Coleman, Houston, for appellee.

Before TUNKS, C.J., Retired, EVANS, C.J., and JACK SMITH, J.

## OPINION

BERT H. TUNKS, Chief Justice, Retired.

The parties to this action were investors in a joint venture to acquire, hold, and develop real estate (the IH–45 venture). Appellee dropped out of the venture in March, 1975, and filed the instant suit two years later alleging that his coventurers had breached certain fiduciary duties owed to him, and had conspired against him, causing him to lose his investment in the venture as well as the value of his share of the property and profits of the venture. A judgment was rendered against appellants James C. Shindler, Fred E. Rizk, Morton A. Cohn, and John M. Greer in the amount of $1,874,000, and appellants Shindler, Rizk, and Cohn were ordered to pay an additional $750,000 in punitive damages to appellee.

Appellants Shindler, Rizk, and Cohn contend generally in this appeal that a take-nothing judgment should have been rendered for them on the basis of the jury's findings and the written joint venture agreement of the parties; and that the trial court erred in applying a rule of fiduciary law to the case which resulted in a jury charge which was erroneous and prejudicial to appellants. Appellant Greer joins in these contentions and additionally complains that the court erred in holding him liable for the acts of Shindler, Rizk, and Cohn.

In eight cross-points, appellee asserts he was entitled to recover an additional $118,500 which he had loaned to Shindler, that the take-nothing judgment for the IH–45 venture and its managing agent, Shindler/Cummins, Inc. was in error, that the court did not correctly submit to the jury the defensive issue of estoppel, and that the jury's findings of no actual damages should be set aside.

In March of 1973, the parties hereto acquired land called the "Grogan tract," consisting of about 2,600 acres lying near Conroe, in Montgomery County. They subsequently purchased additional land in the vicinity of the Grogan tract and within the venture's designated acquisition target area, so that two years after the initial purchase, the venture owned a total of 3,748 acres. Harris, Cohn, and Rizk each held a 25% interest in the project. Greer

owned 2.5% individually and 7.5% as trustee. Shindler owned 15% as trustee for Shindler/Cummins, Inc., the property manager of the venture.

Part of the consideration given for the purchase of the Grogan tract consisted of vendor's lien notes. Money for the payment of these notes, as well as for the operating expenses of the venture, and for the purchase of additional tracts, was raised by assessments against the venturers, or funds calls, payable in proportion to the percentages of their ownership. The venturers were obliged by their agreement to pay such assessments. This understanding of the investors was reduced to writing in a detailed joint venture agreement signed by all the parties in September, 1973, but effective by its terms as of March 15, 1973.

Contemporaneously with the IH–45 Venture, Harris and Rizk were partners in an investment project involving a tract of land known as the Westheimer-Synott tract. In 1974, Harris failed to pay his share of the costs of that project. In order to prevent foreclosure of liens on the Westheimer-Synott land, Rizk was forced to pay not only his own part of the costs of the venture, but also Harris's share. On March 27, 1975, Harris conveyed his one-half interest in the property to Rizk in consideration of Rizk's arranging to release Harris from liability on a note that the two of them had executed to a bank to finance the Westheimer-Synott project. At the time he deeded the property to Rizk, Harris had invested approximately $500,000, which was forfeited in consideration of Rizk's assumption of Harris's liability.

In the fall of 1974, a problem arose as to the minerals under the Grogan tract. The venture owned only the surface of that tract. The minerals were owned by Sabine Royalty Co. in Dallas. When the Grogan tract was acquired by the venture, the investors expected the City of Conroe to annex the area surrounding the tract, and to adopt regulations which would prevent the owners of the minerals under the Grogan tract from any use of the surface which would interfere with its development for residential and/or commercial uses. The City, however, decided not to annex the area, and Sabine Royalty filed suit against the venture to enjoin it from developing the property.

The venturers decided that in order to protect their investment, it would be necessary to acquire the outstanding mineral interest. This decision was made despite their feeling that the minerals owner was demanding a price that was more than the minerals were, per se, worth. The evidence indicates that Harris did not protest this decision at the time it was made. The venture bought the minerals from Sabine Royalty for approximately $800,000 in January 1975. Harris objected to the increased financial burden of the purchase, and there is evidence that the venture offered to structure the minerals acquisition so that Harris could continue in the venture without actually participating in the minerals acquisition.

During this same period, Harris told the other IH–45 venturers that he could not, and would not, pay his share of any future assessments for the carrying costs of the venture. He asked them to buy out his share in the venture, but the other venturers declined to do so. (The venture agreement allowed a venturer to offer his interest to another venturer, but imposed no obligation on the offeree to accept such an offer.) There is evidence that although Harris and his co-venturers each had a balance sheet showing considerable net worth in 1974–75, they all were having difficulty meeting money demands on them because of cash flow problems created by the depressed economic situation of the real estate market at that time.

When Harris made his offer to sell his interest to his fellow venturers and told them that he would not be able to pay any further calls made on him, the venture searched for another investor who would be willing to buy out Harris's interest and help carry the continuing costs of the project. No such buyer was found.

A payment on the note given for the purchase of the Grogan tract came due on March 13, 1975. On February 20, 1975 the property manager sent written notice to all the venturers, including Harris, calling for each of them to pay into the venture his share of the monies necessary to service the note. That call requested payment from Harris of $144,976 by March 11, 1975. Harris did not tender to the venture any part of the funds called for. On March 13, 1975, the property manager delivered to Harris a written notice that he was in default and notified him that he had ten days in which to remedy that default. Harris failed to cure the default and expressed no intention of paying his share of the funds call. On March 24, 1975 the property manager reduced Harris's interest in the joint venture and its property to zero. At that time, Harris had paid into the venture, in response to calls made to him by the venture, approximately $776,000. The funds call, notice of default, and termination of Harris's interest upon his failure to cure his default within the ten day grace period, were all actions explicitly authorized by the joint venture agreement for the IH–45 venture.

Cohn approached Mrs. Vivian Smith, his mother-in-law, on March 8, 1975, five days before the Grogan note payment came due, and asked for her help in protecting his and her daughter's investment in the venture. Mrs. Smith agreed that if Harris indeed defaulted by failing to pay his share of the funds call, she would take over what had been Harris's interest in the venture and contribute to its financing.

On March 14, 1975, Mrs. Smith signed a note to the First City National Bank in Houston, for $3,100,000. Cohn, Rizk, and Shindler joined in the execution of that note. By agreement the proceeds of that note were used, first, to pay off a note, made by Cohn, his wife, and Rizk to the South Main Bank in the amount of $1,500,-000. This South Main note was for a loan taken out two years earlier to finance their 50% share of the costs of the venture for its first two years. The remainder of the proceeds were used to pay the March 13 installment on the Grogan note and all of the future costs incurred by the venture except those costs attributable to the 10% interest held by Greer, trustee, who continued to finance his share of the carrying costs of the venture independently.

The day after Harris's default, Shindler, acting as Harris's attorney-in-fact, as authorized by the venture agreement, executed a deed conveying Harris's interest in the venture and its property to Cohn, as trustee for Mrs. Smith. Harris knew that the venture had avoided default on the property notes despite his breach, but was not told how it was done.

In the spring of 1980 the IH–45 venture sold the Grogan tract. A profit was made on the sale which was apportioned between the surviving participants in the venture in accordance with their agreement.

The plaintiff went to trial on three general theories as alleged in his Seventh Amended Original Petition: (1) that the defendants wrongfully expanded the fixed scope of the venture by the acquisition of the minerals under the Grogan tract; (2) that the defendant venturers entered into a conspiracy to transfer his interest in the venture to Mrs. Smith in exchange for her lending her financial aid to the venture; and (3) that the defendant venturers breached their fiduciary duty to him in concealing from him Mrs. Smith's willingness to contribute financial help to the venture in exchange for his 25% interest in the venture.

Defendants answered generally that the acquisition of minerals was not wrongful, that Harris forfeited his interest in the venture in accordance with the joint venture agreement by failing to cure the breach of his obligation to pay his share of the carrying costs of the venture, that Harris's cause of action was therefore precluded by an abandonment and/or waiver of the rights he now asserted, and that Harris should be estopped from recovering from defendants because of his own role in the events which gave rise to the suit.

With regard to the plaintiff's theories of liability, the jury found that there was a fiduciary relationship between Harris, the IH–45 venture, and all of its members except Greer. The jury rejected Harris's contention that the minerals acquisition was wrongful or was intended to drive Harris out of the venture, and these findings are not contested on appeal. The jury did find that Rizk, Cohn, and Shindler had conspired with each other to induce Mrs. Smith to help finance the venture by offering her Harris's interest, should he default, but they also found that the agreement with Mrs. Smith was not entered into with the intent to secure an advantage over Harris. They also found that the events leading to the conveyance to Mrs. Smith of Harris's interest were material facts which should have been disclosed to all the joint venturers, and that these facts were not disclosed to Harris.

■ Appellants contend that the fiduciary standards which were applied in the charge to the jury were inapplicable because the financing activities complained of were not within the scope of the joint venture agreement or the fiduciary relationship created by that agreement. The jury finding that payment of joint venture obligations was not a venturer's personal business, does not answer appellants' contention that obtaining financing to meet those obligations was a personal matter outside the scope of the venture. While there is merit in appellants' argument, it is unnecessary to review the court's charge or the jury's findings regarding conspiracy and breach of fiduciary duty in light of the jury findings that the actions taken by the venture did not cause any damage to Harris, and that Harris had abandoned his interest in the venture. These facts precluded any recovery by Harris unless Harris is entitled to have them set aside as against the great weight and preponderance of the evidence.

■ Both of Harris's theories of liability turned on the venture's failure to disclose to him Mrs. Smith's agreement to co-sign a note in exchange for Harris's interest in the venture. Harris's burden at trial, therefore, was to prove, by a preponderance of the evidence, that the venture's failure to disclose to him the financial arrangements with Mrs. Smith proximately caused him to lose his interest in the venture. To do this, Harris had to demonstrate that full disclosure somehow might have enabled him to avoid the damages he alleges were caused by the failure to disclose.

Harris testified at trial that if he had known that Mrs. Smith was willing to help the venture obtain additional financing by co-signing a note, he would have approached her and offered to sign the note as well. In lieu of exchanging Harris's defaulted interest for Mrs. Smith's financial backing, Harris would have offered to release a portion of his interest, and proposed that the remaining inducement to Mrs. Smith to sign "could have come from the other venturers who benefitted by offering my interest to her." He had no contingency plan for what he would have done if he had been told about the arrangement, had offered to participate, and this offer had been rejected.

Harris admitted that Mrs. Smith, Rizk, and Cohn had no obligation to agree to be jointly liable with him on a note. Mrs. Smith testified that she signed the note to assist her daughter and son-in-law, Cohn. Cohn had gone to his mother-in-law to obtain additional financial backing for the venture, which was in danger of defaulting on the Grogan note because of Harris's failure to pay his 25% share of the venture's costs. Rizk had just taken over Harris's interest in the Westheimer-Synott project after a similar default by Harris. The facts therefore do not support Harris's theory that Mrs. Smith, Cohn, and Rizk might have agreed to be jointly liable with him on the new $3,100,000 note. Harris never alleged, nor does the record indicate, that his co-venturers could be required to give up part of their interests in the venture to help Harris obtain financing.

Harris nevertheless insisted that it was impossible to say what he might have done had he known of the arrangements, and

that he was wronged by being denied the information. This contention is equivalent to a claim that a wrong entitles an injured party to compensation for a loss, without any necessity of proving that the loss was caused by the wrong.

■ The jury was asked what sum of money, if any, would compensate Harris "for his damages, if any, *caused by* (a) the demand, if any, that he participate in the purchase of the Sabine minerals and/or (b) the reduction, if any, of his joint venture capital account to zero; and/or (c) the execution of the deed on March 25, 1975, to Morton A. Cohn, trustee." Emphasis added. The jury answered "None." The jury found in a separate issue that Harris abandoned his interest in the joint venture.

In his fifth cross-point, Harris contends that the damage issue "does not inquire whether his loss was caused by the actions of the joint venturers; it merely asks what sum of money would fairly compensate him." The jury had already found that Harris's interest had a market value of $1,874,000, in March of 1975, that his interest in the venture was reduced to zero on March 24, 1975, and that his interest was conveyed to Cohn as trustee for Mrs. Smith on that date. The only reasonable explanation for the jury's finding of no damages was that it determined that Harris's loss had *not* been "caused by" the venturers' actions, but rather by his own abandonment of his interest in the venture.

In a separate special issue, the jury was asked to find the amount of money, if any, that would compensate Harris "for his damage, if any, proximately caused by the civil conspiracy, if any, you have so found." The jury likewise answered that issue, "None."

Those were the only issues submitted which inquired as to the money damage to plaintiff caused by the appellants' wrongful acts. From the jury's answers to those issues, it is apparent that the jury believed, as the evidence supports, that even if the other venturers had fully disclosed to Harris the actions they were taking to mitigate damages caused by Harris's default, Harris

still would have forfeited his interest in the venture.

In *Estate of Stonecipher v. Estate of Butts,* 591 S.W.2d 806 (Tex.1980), the court made clear that in an action for conspiracy, like any other tort, proximate cause of damages must be proved. The Court quoted from 2 A.L.R. 287–293 as follows:

Merely to conspire to commit a wrong is not actionable, and imposes no civil liability upon the members of the conspiracy. To enable the injured person to maintain an action for damages based upon a conspiracy, it must be shown that the defendants have been guilty of the commission of a wrongful act in violation of some right of the complainants, *and that damage has resulted as a proximate consequence of the wrongful act complained of.*

591 S.W.2d at 808 (Emphasis added).

■ Here the jury failed to find that the conspiracy caused Harris any damage. It also failed to find that the defendants' actions, which allegedly constituted a breach of fiduciary duty and a conspiracy, caused the plaintiff to sustain any damage. Our review of the record indicates that appellants might have been entitled to a directed verdict because of Harris's failure to prove the essential element of proximate cause. The jury's findings, that no damages were caused by the acts of which Harris complained, were amply supported by the evidence. Appellants' fifth point of error is sustained and we hold that appellants were entitled to a take-nothing judgment because of the jury's findings of no causation of damages.

The jury also found that Harris abandoned his interest in the joint venture. We sustain appellants' sixth point of error and rule that the trial court erred in not rendering a take-nothing judgment for appellants on the basis of that jury finding.

■ Harris contends that the trial court's order that any abandonment be set aside has the same effect as disregarding the jury's finding in accordance with Rule 301 and Harris's motion to disregard. He

then contends that it was proper to disregard the finding of abandonment because there was no evidence that Harris intentionally relinquished his interest in the joint venture, and because title to real estate cannot be lost by abandonment.

The record does not reflect the trial court's ruling on Harris's motion. However, assuming that the court's judgment had the effect of setting aside the jury's finding of abandonment, we find that it was error to disregard the finding for the following reasons.

Harris testified that he understood that a failure to pay his funds call within ten days of notice of default would put him at risk of forfeiting his interest in the venture under the terms of the joint venture agreement. Therefore, Harris's notice to the venturers that he did not intend to pay his share of future costs, followed by his nonpayment and failure to cure within ten days of notice of default, are evidence of an intentional relinquishment of his rights in the venture. At the same time Harris defaulted in the IH–45 venture, he deeded over his interest in the Westheimer-Synott land to Cohn, expressly forfeiting his equity and interest in that project. This demonstrates Harris's willingness to trade his equity in a project for relief from the costs of carrying the project, and therefore also supports the jury's finding of an intentional relinquishment of his interest in the IH–45 venture. This evidence amply supported the jury's finding of abandonment, and the trial court was therefore not entitled to set aside the finding or the abandonment.

Harris's argument that title to real estate cannot be lost by abandonment is immaterial, since it is uncontroverted that Harris's 25% interest in the real estate owned by the venture was conveyed to Cohn as trustee by written deed, not by abandonment. This transfer was authorized by the joint venture agreement and occurred after the ten-day cure period had expired without any tender by Harris of his share of the funds call. Additionally, the real estate acquired by the IH–45 venture was sold to third parties not involved in this suit, and Harris did not seek to recover his interest in the realty. Rather, Harris's suit is based on rights flowing from his 25% interest in the venture, which is personalty which the jury found he had abandoned. His intentional relinquishment of his interest should have barred his recovery.

The trial court's judgment indicates that judgment for Harris was based on the Texas Partnership Act rather than on the jury's verdict. We must therefore determine whether this action is governed by the Partnership Act provisions upon which the trial court relied.

The trial court's judgment read as follows:

CONSIDERED in the accounting between the parties that the reduction of H.B. Harris, Jr.'s capital account in IH–45 Venture to zero, and the deed dated March 25, 1975, recorded in Vol. 887, Page 356 of the Deed Records of Montgomery County, Texas, of H.B. Harris, Jr.'s 25% interest in the IH–45 Venture land to Morton A. Cohn, Trustee, as between the parties hereto, and any relinquishment or abandonment of his interest or act inconsistent with his interest in the venture or land are set aside, it is therefore

ORDERED, ADJUDGED AND DECREED that H.B. Harris, Jr., for the value of his interest in such venture and land under Sec. 42 of Article 6132b Revised Civil Statutes, do have and recover of and from the Defendants, James C. Shindler, individually and as trustee, Morton A. Cohn, individually and as trustee, John M. Greer, individually and as trustee, and Fred E. Rizk, jointly and severally, $1,874,000.00 with interest thereon, at the rate of 10% per annum from March 24, 1975, until date this Judgment is signed, and interest thereon at the rate of 9% per annum from date this Judgment is signed until paid, for which execution may issue; and it is ORDERED, ADJUDGED AND DECREED that H.B. Harris, Jr., do have and recover from James C. Shindler,

Morton A. Cohn, and Fred E. Rizk, jointly and severally, the further sum of $750,000 with interest thereon at the rate of 9% per annum from the date this Judgment is signed until paid, for which execution may issue.

*Park Cities Corp. v. Byrd*, 534 S.W.2d 668 (Tex.1976) involved the winding up of a limited partnership. In order to resolve the dispute over the general partner's duty to reimburse the partnership for her capital account deficit, the court said, at page 672:

> The agreement of the parties is to be controlling of our decision and we shall construe and interpret their agreement pursuant to the applicable law of contracts.... We look to the Texas Uniform Partnership Act for guidance only when the partnership agreement is silent.

While the contract here involved relates to a joint venture, rather than a partnership, the same rule of construction applies to it. *See, Hackney v. Johnson*, 601 S.W.2d 523 (Tex.Civ.App.—El Paso 1980, writ ref'd n.r.e.); *Gibson v. Northeastern National Bank*, 602 S.W.2d 337 (Tex.Civ. App.—Fort Worth 1980, writ ref'd n.r.e.).

The trial court rendered judgment for the value of Harris's interest under sec. 42 of art. 6132b, Tex.Rev.Civ.Stat.Ann., which reads, in pertinent part, as follows:

> Sec. 42. When any partner *retires* or *dies*, and the business is continued ... without any settlement of accounts as between him or his estate and the person or partnership continuing the business, *unless otherwise agreed*, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership.

(Emphasis added.)

That statute does not entitle Harris to the judgment that the trial court rendered.

In the first place, it is only applicable if a partner *retires* or *dies*. Harris did not retire from the venture or die—he was *expelled* because he breached his contractual obligation to pay his share of the funds needed to carry the venture. Harris himself refers to this "expulsion from the venture" in his brief on appeal.

Secondly, the statute only applies when the parties have not "otherwise agreed" on how to settle the account of a partner who withdraws. The parties to this action explicitly agreed on the disposition of a defaulting venturer's interest. Harris sued on the joint venture agreement, and there is no contention that the agreement is ambiguous. This written agreement provided that, in the event that any venturer fails to make any payment required of him, the other venturers

> [S]hall have the right (but no obligation) to make such payment to the Venture. Upon such payment, the Defaulting Venturer's interest in the Joint Venture and Property shall for all purposes hereof be reduced to zero, and the percentage interest in the Joint Venture and Property which such Defaulting Venturer theretofore had shall for all purposes hereof be allocated pro rata to the Non-Defaulting Venturers in the ratio in which such Non-Defaulting Venturers make the additional contributions to the Joint Venture which the Defaulting Venturer has failed to make. Thereafter, the Defaulting Venturer shall have no interest in the percentage interest so reallocated and no rights with respect thereto.

The agreement also provided that, if the other venturers failed to make such payment,

> [T]he Property Manager is hereby designated as the agent and attorney in fact for the Defaulting Venturer with full right and power of attorney to transfer and assign for and on behalf of the Defaulting Venturer, all of the interest of such Defaulting Venturer in the Joint Venture and Property to any third party acceptable to the Non-Defaulting Ventur-

er who, as consideration for such interest, agrees to make such contribution and become a substitute Venturer in lieu and place of the Defaulting Venturer. Should such assignment occur, the Defaulting Venturer and all other Venturers agree to execute any and all instruments necessary to confirm such substitution.

Harris argues that, because the third party who received his interest did not agree to become a substitute venturer, the transfer of his interest to Mrs. Smith was not in compliance with the contract provisions and therefore should not result in the reduction of his interest to zero. That argument is rejected. The contractual provision that the transfer be made to one who agrees to become a venturer was for the benefit of the non-defaulting venturers. Harris, as the defaulting venturer, has no standing to complain that the contract was not complied with in that respect. The non-defaulting venturers had the right to, and did, waive the provision.

█ The agreement that a venturer lose his interest in the venture if he defaults on his obligation to pay the calls for money, is akin to a forfeiture provision. In *Pitman v. Sanditen*, 611 S.W.2d 663, 668 (Tex.Civ. App.—San Antonio 1980), rev'd on other grounds, 626 S.W.2d 496 (Tex.1982), the court said:

While forfeitures are not favored, they are not illegal.... When the parties in unambiguous language write into their agreement a provision for forfeiture, the courts will enforce the provision.

*See also, Golden State Mut. Life Ins. Co. v. Kelley,* 380 S.W.2d 139, 142 (Tex.Civ. App.—Houston 1964, writ ref'd n.r.e.) and *Wood Motor Co. v. Nebel,* 150 Tex. 86, 238 S.W.2d 181, 185 (1951). The joint venture agreement's provision for forfeiture is clear and unequivocal and should have been enforced by the court below to bar Harris's suit.

It is worth noting that in this case the forfeiture provisions of the joint venture agreement were not unqualified. The reduction of Harris's interest to zero oc-

curred upon his breach of his contractual obligation, which breach could have given rise to a common law cause of action against him. The same section of the venture agreement which authorized the reduction of his interest to zero also provided:

Any provision contained in this Article VII or elsewhere in this Agreement to the contrary notwithstanding, it is understood that a Defaulting Venturer shall never be held personally liable to any other Venturer for any monetary or deficiency judgment and that the sole remedy or recourse against a Defaulting Venturer shall be the reduction of his percentage interest or sale of such Venturer's interest in the Property as above provided.

The agreement clearly contemplated that while the venturers relied on one another for their ability to carry the project to completion, a venturer could drop out of the project without risking potential lawsuits should his default cause financial loss to the remaining venturers. The only recourse of the non-defaulting venturers was either to default also and lose their investment, or to somehow cover the defaulter's share of the payments. Thus the provision reducing an investor's interest to zero was in consideration of the non-defaulting venturers' waiver of their cause of action against the defaulter for breach of contract.

█ In summary, the parties to the joint venture agreement explicitly agreed that the venture could be carried on even if one of the venturers dropped out, and that the defaulting venturer forfeited his equity and interest in the venture in exchange for legal immunity from any injurious consequences of his default. Section 42 of the Texas Partnership Act is therefore inapplicable, and the trial court erred in entering judgment for appellee under its provisions.

Harris's first three cross-points concern an agreement executed by Harris, Cohn, Rizk, and Shindler, contemporaneously with the joint venture agreement. That agreement recited that:

WHEREAS, the undersigned persons and John M. Greer, Individually and as Trustee, entered into a Joint Venture Agreement, I.H.–45 Venture, dated March 15, 1973; and

WHEREAS, the agreement of the parties as set out herein was a material agreement leading to the execution of such Joint Venture Agreement by James C. Shindler, Trustee; and

WHEREAS, it is the desire of the parties to set out such agreement:

NOW, THEREFORE, for and in consideration of the premises, of the promises contained herein *and of the promises contained in the Joint Venture Agreement,* the undersigned have agreed, and do hereby agree, that Morton A. Cohn, H.B. Harris, Jr. and Fred E. Rizk shall each loan to James C. Shindler, Trustee one-third of all funds to be contributed by James C. Shindler, Trustee to the I.H.–45 Venture, including the initial contribution and all contributions thereafter required of James C. Shindler, Trustee as a Venturer, it being agreed that James C. Shindler, Trustee shall execute therefor non-interest bearing promissory notes in the amount of each loan as made, payable upon demand.

(Emphasis added).

The venture, from its inception until Harris's expulsion, made calls upon Harris, not only for his 25% of the costs incurred, but also for 5% of those costs, representing Harris's obligation to pay one-third of Shindler's 15% interest in the venture, pursuant to the above carry agreement.

Harris paid his ⅓ share of Shindler's expenses until his expulsion on March 24, 1975. Thereafter, he made no further such payments. Cohn and Rizk assumed these payments and each paid ½ of the venture's costs chargeable to Shindler's interest. When the Grogan tract was sold, the venture divided the proceeds of the sale among the venturers, and Shindler reimbursed Cohn and Rizk for the payments they had made on his behalf. Harris was not reimbursed for the $129,359 which he paid into the venture on Shindler's behalf.

▪ The recitations in the contract between Cohn, Rizk and Harris on the one hand, and Shindler, on the other, clearly indicate that it was entered into contemporaneously with the joint venture agreement, and that it was effective as a part of that agreement. Therefore, the two contracts must be construed together, and the provisions of the main agreement as to the consequences of a default are applicable to breaches of the carry agreement. Harris himself viewed his payments under the carry agreement as part of his investment in the venture, because he consistently alleges he invested approximately $750,000 in the venture, which in fact *includes* the $129,359 he paid on Shindler's behalf.

Harris contends, however, that he is nonetheless entitled to recoup the sums he paid on Shindler's behalf because he is subrogated to the indebtedness evidenced by a note for $118,500 executed by Shindler to Continental Bank which Harris repaid pursuant to his agreement to guaranty that note. The proceeds of this note were used to pay Harris's share of Shindler's contribution to the venture.

Shindler testified that he agreed to be the borrower of record on the note because Harris had already borrowed as much as bank policy would permit. The understanding of the parties was that Shindler was signing as a favor to Harris, but that Harris would be solely liable on this note. Harris contends that the court erred in letting in this testimony despite his parol evidence objection, and that without this evidence, his right to recover against Shindler as maker of the note is established as a matter of law.

▪ The guaranty agreement and the note do not say anything about the obligations or agreement, if any, between Harris and Shindler. Construing the note and the guaranty agreement together, there is no integration clause in either document which would require exclusion of evidence of collateral agreements which do not directly vary or contradict the terms of the written agreement. Additionally, although Harris

is subrogated to the liability evidenced by the note, he does not step into the shoes of the payee, nor is he a holder in due course, because Harris presumably knew, when he paid off the note, of his agreement with Shindler that he was to be primarily liable on the note. Therefore, neither the parol evidence rule nor U.C.C. chapter 3 rules governing negotiable instruments required the court below to sustain appellee's objection to Shindler's testimony.

■ The jury found that Shindler was an accommodation maker on the note, who had signed it to lend his credit to Harris; that Harris breached the carry agreement; and that Shindler's demand notes to Harris under the carry agreement were not to become effective until Harris had made all payments required by that agreement. There was evidence to support these findings and therefore the court did not err in entering a take-nothing judgment for Shindler.

Because the judgment against appellants must be reversed for errors raised in their fifth and sixth points, we find it unnecessary to address the remaining issues raised by this appeal.

The judgment of the trial court is reversed in part and judgment is rendered that Harris take nothing against the defendants James C. Shindler, individually and as trustee, Morton A. Cohn, individually and as trustee, John M. Greer, individually and as trustee, and Fred E. Rizk. The portion of the trial court's judgment effectively denying any recovery against Shindler/Cummins, Inc. and the IH–45 venture, or any recovery against Shindler on the note, is affirmed. All court costs are charged to appellee.

EVANS, C.J., not participating.