Robert **HITZELBERGER,** Appellant,

v.

**SAMEDAN OIL CORPORATION,**
et al., Appellees.

No. 10–96–020–CV.

Court of Appeals of Texas,
Waco.

June 25, 1997.

Rehearing Overruled July 23, 1997.

500

**502**

Glenn Sodd, Ron Edmondson, Dawson, Sodd, Moe, Jacobson & Beard, P.C., Corsicana, for appellant.

Jack K. Smith, Russell & Associates, Corsicana, Scott Patrick Stolley, John H. Martin, Greg W. Curry, Thompson & Knight, Dallas, for appellees.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

DAVIS, Chief Justice.

This case concerns the construction of an oil and gas lease and a unit agreement. Robert Hitzelberger sued Samedan Oil Corp., et al. (collectively "Samedan") for a declaration that his lease terminated due to the late payment of royalties and for other relief. After a bench trial based entirely upon submitted documents, the trial court found in Samedan's favor and declared the lease to be in effect. From this decision Hitzelberger now appeals. Because the trial court erred as a matter of law in finding that Hitzelberger's lease did not terminate, we reverse and render in part and reverse and remand in part.

In 1990, NCNB Texas National Bank signed an oil and gas lease with Massad Oil Company covering tracts of land in Navarro County. Through intervening conveyances Hitzelberger became the successor to NCNB, while Samedan succeeded Massad

Oil. Samedan, wanting to expand its area of development, asked Hitzelberger to sign a unit agreement to pool his tracts with other surrounding tracts to form the South Kerens Unit. Hitzelberger agreed to sign if the royalty provisions in his lease survived the unit agreement. Samedan accepted this condition and altered its unit agreement in an attempt to satisfy Hitzelberger's request. Subsequently, Samedan developed a producing well within the unit, but not located on Hitzelberger's land. The first sale of oil from this well occurred on June 12, 1992. Samedan paid an initial royalty to Hitzelberger 120 days later on October 10, 1992. After timely making two monthly royalty payments, Samedan failed to make the monthly royalty payments due in January and February of 1993 in accordance with the royalty provisions of Hitzelberger's lease.[1] Thereafter, Hitzelberger notified Samedan that the lease terminated because of the late payment of royalties. Samedan refused to release the lease; whereupon, Hitzelberger brought this action. After a bench trial, the court made the following conclusions of law:

1. The lease is unambiguous.

2. The unit agreement is unambiguous.

3. The primary term of the lease was three years from May 2, 1990, the date of execution of the lease.

4. Samedan made timely payment of royalties for production.

5. If Samedan failed to make timely payments of royalties for production during the primary term of the lease, then that failure to pay royalties does not cause the lease to terminate.

6. In the alternative, Samedan's failure to make timely payments of royalties for production does not cause termination of the lease during the term of the unit agreement.

7. The lease has not terminated, and remains in full force and effect.

8. Samedan did not commit fraud.

---

1. Samedan admitted that a clerical error prevented the January and February royalty checks from being sent to Hitzelberger. This clerical error resulted when a Samedan employee put a hold on Hitzelberger's payments until he re-

turned a signed division order. Hitzelberger's lease did not require him to sign a division order to receive royalty payments. Samedan does not dispute this.

Based on these conclusions, the trial court decided the lease had not terminated because: (1) under the lease's habendum clause, the lease cannot terminate during the primary term, even if the royalty payments were late; (2) the unit agreement amended the lease, so that the lease cannot terminate for late royalty payments during the term of the unit agreement; or (3) Samedan timely paid the initial royalty by tendering payment within 120 days of the first production from the "leased premises"—a well under Hitzelberger's tracts.

Initially, we address the appropriate standard of review to be applied in reviewing a bench trial. A trial court's findings of fact are reviewed for factual sufficiency of the evidence under the same legal standards as applied to review jury verdicts for factual sufficiency of the evidence. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996). In this review, we must weigh all of the evidence in the record. *Id.* Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Id.* We review the trial court's conclusions of law de novo as legal questions. *Piazza v. City of Granger,* 909 S.W.2d 529, 532 (Tex.App.— Austin 1995, no writ); *Kirkwood v. City of Corsicana,* 871 S.W.2d 544, 546 (Tex. App.—Waco 1994, no writ). We will follow a trial court's conclusion of law unless it is erroneous as a matter of law. *Piazza,* 909 S.W.2d at 532; *Westech Eng. v. Clearwater Constructors,* 835 S.W.2d 190, 196 (Tex.App.—Austin 1992, no writ). Even an incorrect conclusion of law will be followed if the controlling findings of fact support a correct legal theory. *Id.*

Hitzelberger's first point of error alleging the trial court erred by entering judgment for Samedan, instead of him, is supported by multiple sub-points. Some of these sub-points include: (1) the course of dealings and the parties' own interpretation showed that both parties understood the withholding of royalty payments would terminate the lease; (2) the lease treated production from anywhere in the unit as "production from the leased premises," and required termination

for the late payment of a royalty from a well anywhere in the unit; (3) the unit agreement treated production from anywhere in the unit as "production from the leased premises," and the unit agreement changes made by Samedan preserved the royalty provisions of Hitzelberger's lease; and (4) the "initial royalty payment" was actually made, thus subsequent payments were due monthly without regard to the well location within the unit. Hitzelberger's second point of error attacks the trial court's conclusion that Samedan made timely payment of royalties. This point of error also attacks the court's findings that (1) the production from the unit in October 1992 did not constitute production from Hitzelberger's "leased premises," (2) the first production from Hitzelberger's "leased premises" occurred on December 28, 1992, and (3) within 120 days Samedan timely tendered a royalty check for the December production. In his ninth point of error, Hitzelberger argues the trial court erred when it concluded that late royalty payments during the primary term do not cause the lease to terminate. Hitzelberger's tenth point of error complains of the trial court's alternative finding that Samedan's failure to make timely royalty payments does not cause termination of the lease during the term of the unit agreement. Additionally, Hitzelberger argues in his eighth point that if the lease and unit agreement are not interpreted as he claims, then their meaning is at least ambiguous.

An oil and gas lease is a contract and must be interpreted as a contract. *TSB Exco v. E.N. Smith, III Energy Corp.,* 818 S.W.2d 417, 421 (Tex.App.—Texarkana 1991, no writ). Whether a contract is ambiguous is a question of law for the court to decide. *Friendswood Development Co. v. McDade + Co.,* 926 S.W.2d 280, 282 (Tex.1996); *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983). This determination is made by looking at the contract as a whole in light of the circumstances present when the parties entered the contract. *Id.* If a contract is worded in such a manner that it can be given a definite or certain legal meaning, then it is not ambiguous. *Friendswood Development Co.,* 926 S.W.2d at 282; *Coker,* 650 S.W.2d at 393; *R & P Enterprises v. LaGuarta, Gavrel &*

*Kirk,* 596 S.W.2d 517, 519 (Tex.1980). On the other hand, a contract is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Coker,* 650 S.W.2d at 393; *R & P Enterprises,* 596 S.W.2d at 519. If there is no ambiguity, the construction of a written instrument is a question of law for the court. *Westwind Exploration v. Homestate Sav. Ass'n.,* 696 S.W.2d 378, 381 (Tex.1985); *Coker,* 650 S.W.2d at 393.

■■■■ As with any contract, the ultimate goal in interpreting a lease is to determine the parties' intent. *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 727–28 (Tex.1981); *Kiewit Texas Min. Co. v. Inglish,* 865 S.W.2d 240, 244 (Tex.App.—Waco 1993, writ denied). When construing a lease to seek the intention of the parties, we consider all the provisions of the lease and by harmonizing, if possible, those provisions which appear to conflict by using the applicable rules of construction. *Ogden v. Dickinson State Bank,* 662 S.W.2d 330, 332 (Tex. 1983); *Coker,* 650 S.W.2d at 393. However, no single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole lease. *Coker,* 650 S.W.2d at 393. Because the parties to a lease intend every provision to have some effect, we will not strike down any portion unless there is an irreconcilable conflict. *Ogden,* 662 S.W.2d at 332. We also give terms their plain, ordinary, and generally accepted meaning unless the lease shows that the parties used them in a technical or different sense. *Western Reserve Life Ins. Co. v. Meadows,* 152 Tex. 559, 261 S.W.2d 554, 557 (1953). If after applying the established rules of construction, a lease remains reasonably susceptible to more than one meaning, extraneous evidence is admissible to determine the true meaning of the lease. *R & P Enterprises,* 596 S.W.2d at 519. Otherwise, we will enforce an unambiguous lease as written; and, in the ordinary case, the writing alone will be deemed to express the intention of the parties. *Sun Oil Co.,* 626 S.W.2d at 728.

This lease construction dispute regards how Hitzelberger's lease interacts with the unit agreement. The habendum clause in Paragraph 2 of Hitzelberger's lease provides:

Subject to the other provisions hereof, this lease shall be for a term of Three years from this date (called "Primary Term") and as long thereafter as oil and gas, or either of them, is produced in paying quantities from said land or lands with which said land is pooled hereunder and the royalties are paid as provided.

The crux of this dispute centers around the royalty clause contained in Paragraph 3 of Hitzelberger's lease. Paragraph 3 provides:

(g) Within 120 days following the first sale of oil or gas produced from the leased premises, settlement shall be made by Lessee or by its agent for royalties due hereunder with respect to such oil or gas sold off the premises and such royalties shall be paid monthly thereafter without the necessity of Lessor executing a division or transfer order. If said initial royalty payment is not so made under the terms hereof, this lease shall terminate as of 7 A.M. the first day of the month following expiration of said 120–day period. After said initial royalty payment, with respect to oil or gas produced during any month, if royalty is not paid hereunder on or before the last day of the second succeeding month, this lease shall terminate at midnight of such last day.

Paragraph 4 of the lease contains a typewritten sentence, which provides "[t]his is a paid up lease and all references to delay rentals shall be disregarded." Paragraph 5 of the lease grants the Lessee the right to pool or combine the lands covered by the lease or any part thereof.[2] This pooling provision in Hitzelberger's lease provides:

For the purpose of computing the royalties and other payments out of production to which the owners of such interests shall be

---

2. We recognize that the unit agreement was not created pursuant to Paragraph 5 of Hitzelberger's lease. This pooling provision limited any pooled unit created under it to 40 acres. The South Kerens Unit covered almost 1,000 acres. Nevertheless, we find the language of Paragraph 5 instructional regarding the definition of "leased premises" for the royalty provisions of Hitzelberger's lease.

entitled on production of oil and gas, or either of them, from any such pooled unit, there shall be allocated to the land covered by this lease and included in such unit (or to each separate tracts within the unit if this lease covers separate tracts within the unit) a pro rata portion of the oil and gas, or either of them, produced from the pooled unit after deducting that used for operations on the pooled unit. Such allocation shall be on an acreage basis, thus, there shall be allocated to the acreage covered by this lease and included in the pooled unit (or to each separate tract within the unit if this lease covers separate tracts within the unit) that pro rata portion of the oil and gas, or either of them, produced from the pooled unit which the number of surface acres covered by this lease (or in each such separate tract) and included in the unit bears to the total number of surface acres included in the pooled unit. Royalties hereunder shall be computed on the portion of such production whether it be oil and gas, or either of them, so allocated to the land covered by this lease and included in the unit just as though such production were from such land. In the event only a part or parts, of the land covered by this lease instrument is pooled or unitized with other land, or lands, so as to form a pooled unit, or units, operations on or production from such unit or units, will maintain this lease in force only as to the land included in such unit or units.

We cannot look to the circumstances present when the oil and gas lease was signed because neither Hitzelberger nor Samedan is an original party to the lease. *Friendswood Development Co.,* 926 S.W.2d at 282; *Coker,* 650 S.W.2d at 394. Nevertheless, we find this lease to be unambiguous as it can be given a definite or certain legal meaning. *Friendswood Development Co.,* 926 S.W.2d at 282; *Coker,* 650 S.W.2d at 393; *R & P Enterprises,* 596 S.W.2d at 519. Construing these lease provisions together, we conclude that Samedan owed Hitzelberger an initial royalty payment within 120 days from the first sale of oil or gas produced from anywhere within the pooled unit in which Hitzelberger's tracts may be a member. After this initial royalty payment, monthly roy-alties are due on or before the last day of the second succeeding month without Hitzelberger executing a division order. It is also clear that the failure to meet the initial royalty payment or monthly royalty payments will terminate the lease. Furthermore, the paid-up provision in the lease did not require Samedan to make delay rental payments during the primary term of the lease.

Samedan does not dispute the unambiguous nature of this lease. However, Samedan argues it is clear that the lease could not terminate for late royalty payments during the primary term. Samedan claims that "the paid-up nature of the lease gave Samedan an absolute and irrevocable right to the oil and gas from Hitzelberger's tracts for a three-year period." Thus, according to Samedan it "need do nothing" to keep this lease in force during the primary term, including paying royalties. We believe the words clearly express an intention that *delay rentals* need not be paid during the primary term to keep the lease in force. Samedan's interpolation that royalty payments need not be made during the primary term goes beyond the clear expressed intent of the typewritten language in Paragraph 4.

In an attempt to bolster this theory, Samedan draws our attention to the language in the habendum clause granting the secondary term, which provides "as long thereafter as oil and gas, or either of them, is produced in paying quantities from said land or lands with which said land is pooled hereunder *and* the royalties are paid as provided." Samedan contrasts this language with that describing the primary term to show that the twin conditions of production in paying quantities and payment of production royalties applies only to the secondary term. The basis for Samedan contending that the royalty payment condition applies only to the secondary term is the absence of a comma separating the royalty payment condition from the secondary term. Thus, Samedan asserts that timely royalty payments are not necessary during the primary term. We believe Samedan's focusing on the absence of a comma places too great a weight on too frail a reed. To accept this argument we must

ignore the intent expressed in the whole document and focus on punctuation in one sentence. We decline to follow this interpretation. *Coker*, 650 S.W.2d at 393.

■ Samedan asserts that if we construe Paragraph 3(g) to apply during the primary term, then we violate a rule of construction because it will make the paid-up provision in Paragraph 4 meaningless. *Id.* However, this is not the case. Paragraph 4 states that delay rentals are paid-up. Because this provision certainly and definitely applies to delay rentals and not royalty payments, we will apply this unambiguous provision as written. *Sun Oil Co.*, 626 S.W.2d at 728. No delay rentals are due within the primary term. However, royalties become due under Paragraph 3(g) when production begins and the late payment of royalties will result in termination. This construction allows us to harmonize and give effect to the habendum, delay rental and royalty payment provisions. *Ogden*, 662 S.W.2d at 332; *Coker*, 650 S.W.2d at 393.

■ Samedan further urges this Court to classify Paragraph 3(g) as a covenant, instead of a condition. An important distinction exists between a condition and a covenant. *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76, 79 (Tex.1989); *Parten v. Cannon*, 829 S.W.2d 327, 329–330 (Tex. App.—Waco 1992, writ denied). The distinction between conditions and covenants lies in the appropriate remedy for their breach. *Rogers*, 772 S.W.2d at 79; *Parten*, 829 S.W.2d at 330. Breach of a condition results in automatic termination of the leasehold estate upon the happening of the stipulated events. *Id.* Breach of a covenant does not automatically terminate the estate, but instead subjects the breaching party to liability for monetary damages, or in extraordinary

circumstances, the remedy of a conditional decree of cancellation. *Id.* Doubts should be resolved in favor of a covenant instead of a condition. *Id.* The language used by the parties to an oil and gas lease will not be held to impose a special limitation on the grant unless it is clear and precise and so unequivocal that it can reasonably be given no other meaning. *Id.* We find the clear and precise language of Paragraph 3(g) to be a special limitation or condition. Thus, a breach of Paragraph 3(g) results in automatic termination of the lease.

■ Next, Samedan attempts to support its claim that the lease could not terminate for late royalty payments during the primary term by arguing that the habendum clause plays the dominant role in determining the duration of the lease.[3] Relying upon *Gulf Oil Corporation v. Southland Royalty Company*, Samedan professes that when the habendum clause provides "a plain and certain answer to the question of when the lease terminates, we cannot change that answer with words elsewhere in the lease not certainly directed to the same question." 496 S.W.2d 547, 552 (Tex.1973). In light of this authority, Samedan asserts that Paragraph 3(g) of Hitzelberger's lease "does not specifically direct itself toward amending the habendum." We believe Samedan's reliance on *Gulf Oil Corporation* for this proposition is misplaced. In *Gulf Oil Corporation*, the lease's habendum clause granted the lessee a term not to exceed 50 years. *Id.* at 548. The lessors sought to enforce this habendum clause, whereas the lessee argued that the 50–year term should be delayed due to proration orders of the Railroad Commission. *Id.* Attempting to find a lease provision to support its contention, the lessee looked to the force majeure or excuse clause. *Id.*

---

**3.** The primary term of an oil and gas lease is a period during which the lessee has the option of maintaining the lease without drilling upon the property by paying delay rentals. Under Texas law, the primary term, as defined in the habendum clause, is not so sacrosanct that a lease cannot terminate during this period. For example, an oil and gas lease may terminate during the primary term for the incorrect payment of delay rentals. *Nelson Bunker Hunt Trust Estate v. Jarmon*, 345 S.W.2d 579, 581 (Tex.Civ.App.—San Antonio 1961, writ ref'd); *Schell v. Black*, 321 S.W.2d 373, 374–75 (Tex.Civ.App.—Eastland 1959, no writ); *Coker v. Benjamin*, 83 S.W.2d 373, 377–78 (Tex.Civ.App.—Beaumont 1935, no writ); *Young v. Jones*, 222 S.W. 691, 694 (Tex. Civ.App.—El Paso 1920, no writ). In this case, the lease could not terminate for the incorrect payment of delay rentals because of the paid-up provision. However, once Samedan began production it assumed the risk of the lease terminating if it failed to timely pay royalties as provided in the lease.

However, the Supreme Court noted that "the lease is silent about the lessee's rights if some of its wells are not allowed to produce to full capacity." *Id.* at 551. Thus, the court did not find the force majeure or excuse clause was certainly directed to the termination of the lease. *Id.* at 552. Samedan insinuates that any language affecting the term of a lease must directly refer to the habendum clause. This is not correct. The Supreme Court sought to determine if the language was certainly directed toward the question of *termination,* not certainly directed toward the *habendum clause.*

▇▇ Samedan also relies upon *Clark v. Perez* to support its argument that the habendum controls. 679 S.W.2d 710, 714 (Tex. App.—San Antonio 1984, no writ). The court in that case stated that "the habendum clause will control unless properly modified by other provisions, and the fixed term therein stated should not be extended by words found elsewhere in the lease not certainly directed to the modification of the habendum clause." *Id.* However, we disagree with this conclusion and decline to follow the theory that the habendum clause must be modified. The language found elsewhere in the lease must modify the duration of the lease, not the habendum clause.

▇▇ Furthermore, the habendum clause is not the ultimate determiner of the duration of an oil and gas lease. Although the duration of the estate granted is traditionally determined by the habendum clause, this need not be the case. *Gulf Oil Corporation,* 496 S.W.2d at 552. The lease may provide elsewhere for the modification of the term stated in the habendum. *Id.* It is always a question of resolving the intention of the parties from the *entire* lease. *Id.* The labels given to such clauses as "habendum" and "granting" are not controlling, and we should give effect to the substance of unambiguous provisions. *Luckel v. White,* 819 S.W.2d 459, 463 (Tex.1991). We reject Samedan's claim that the habendum clause controls unless another provision specifically refers to it. Moreover, by using the phrases "[s]ubject to the other provisions hereof" and

"the royalties are paid as provided," the habendum clause in Hitzelberger's lease indicates an intent to be modified by other provisions in the lease.[4] Therefore, we find the trial court erred as a matter of law in relying upon this argument to conclude that the lease cannot terminate during the primary term. *Piazza,* 909 S.W.2d at 532; *Westech Eng.,* 835 S.W.2d at 196. However, the trial court did not err in concluding that this lease was unambiguous. *Id.*

▇▇ Because we find the lease to be unambiguous, we cannot consider extrinsic or parol evidence. *Friendswood Development Co.,* 926 S.W.2d at 283; *R & P Enterprises,* 596 S.W.2d at 519. Also, the interpretation given to the unambiguous lease by Hitzelberger and Samedan is of no consequence. Only where a lease is first found to be ambiguous may we consider the parties' interpretation. *Sun Oil Co.,* 626 S.W.2d at 732. Where the meaning of the lease is plain and unambiguous, a party's construction is immaterial. *Id.* Thus, we will enforce this unambiguous lease as written without regard to extrinsic evidence, parol evidence or the parties' interpretation. *Id.* at 728. We overrule that part of Hitzelberger's first point of error relating to the parties' interpretation of the lease.

▇▇ Hitzelberger also argues that if the unit agreement is not given his interpretation, then it is ambiguous. Samedan drafted the unit agreement and allegedly modified it to satisfy Hitzelberger's request that the royalty provisions in his lease survive. The pertinent provisions of the unit agreement provide:

3.1 Oil and Gas Rights Unitized. All Oil and Gas Rights of Royalty Owners in and to the lands described in Exhibits A and C, and all Oil and Gas Rights of Working Interest Owners in and to said lands, are hereby unitized insofar as the respective Oil and Gas Rights pertain to the Unitized Formation, so that Unit Operations may be conducted with respect to the Unitized Formation as if the Unit Area had been included in a single lease executed by all Royalty Owners, as lessors, in favor of all

4.  The words "subject to," used in their ordinary sense, mean subordinate to, subservient to, or limited by. *Kokernot v. Caldwell,* 231 S.W.2d 528, 531 (Tex.Civ.App.—Dallas 1950, writ ref'd).

Working Interest Owners, as lessees, and as if the lease contained all of the provisions of this agreement.

3.3 Amendment of Leases and Other Agreements. The provisions of the various leases, agreements, division and transfer orders, or other instruments pertaining to the respective Tracts or the production therefrom are amended to the extent necessary to make them conform to the provisions of this agreement, but otherwise shall remain in effect.

3.4 Continuation of Leases and Term Interests. Production from any part of the Unitized Formation, except for the purpose of determining payments to Royalty Owners, or other Unit Operations shall be considered as production from or operations upon each Tract, and such production or operations shall continue in effect each lease or term mineral or royalty interest as to all lands and formations covered thereby just as if such operations were conducted on and as if a well were producing from each Tract.

6.1 Allocation to Tracts. All Unitized Substances produced and saved shall be allocated to the several Tracts in accordance with the respective Tract Participation effective during the period that the Unitized Substances are produced. The amount of Unitized Substances allocated to each Tract shall be deemed for all purposes to have been produced from such Tract regardless of whether the amount is more or less than the actual production of Unitized Substances from the well or wells, if any, on such Tract.

6.2 Distribution Within Tracts. The Unitized Substances allocated to each Tract shall be distributed among, or accounted for, to the parties entitled to share in the production from such Tract in the same manner, in the same proportions, and upon the same conditions as they would have participated and shared in the production from such Tract, or in the proceeds thereof, pursuant to individual oil and gas lease and royalty provisions, had this agreement not been entered into, and with the same legal effect.

6.5 Responsibility for Royalty Settlements. Any party receiving in kind or separately disposing of all or part of the Unitized Substances allocated to any Tract shall be responsible for the timely payment (as provided by law or the term of any oil and gas lease) of all royalties, overriding royalties, production payments, and all other payments chargeable against or payable out of such Unitized Substances, and shall indemnify all parties hereto, including Unit Operator, against any liability for such payment.

17.1 Term. The term of this agreement shall be for the time that Unitized Substances are produced in paying quantities or other Unit Operations are conducted without a cessation of more than ninety (90) consecutive days, unless sooner terminated by Working Interest Owners in the manner herein provided.

17.2 Termination by Working Interest Owners. This agreement may be terminated by Working Interest Owners owning a combined Unit Participation of seventy-four percent (74%) or more whenever such Working Interest Owners determine that Unit Operations are no longer profitable or feasible.

We find that it is possible to harmonize all of the provisions in this unit agreement. *Ogden,* 662 S.W.2d at 332; *Coker,* 650 S.W.2d at 393. After harmonizing these various provisions, we find the unit agreement unambiguous because we can give it a certain and definite legal meaning. *Friendswood Development Co.,* 926 S.W.2d at 282; *Coker,* 650 S.W.2d at 393; *R & P Enterprises,* 596 S.W.2d at 519.

Article 3.1 expresses an intent to maximize recovery and efficiency by conducting uniform operations throughout the pooled unit as if a single lease covered the entire area. This intent is carried out by Article 3.3, which amends the individual leases to the extent necessary to make them conform to the unit agreement. However, Article 6.2 indicates that Hitzelberger is to be paid according to his individual lease. Furthermore, Article 6.5 makes any party receiving oil and/or gas allocated to any tract responsible for timely paying royalties as

provided by law or the terms of any oil and gas lease. Articles 3.1 and 3.3 relate to the *operation* of the unit, while Articles 6.2 and 6.5 relate to the *payment* of royalties after production is achieved.[5] Thus, the unit agreement amends the individual oil and gas lease's provisions relating to operations, but leaves the lease provisions relating to royalty payments in effect.[6] Article 3.3 supports this interpretation by declaring that all oil and gas lease provisions not contradicting uniform operations shall remain in effect. Although Samedan may incur additional administrative expenses in complying with the royalty provisions of the individual leases, this interpretation does not interfere with the uniform operations of the unit.

■■■ The unit agreement also defines what constitutes production from the leased premises. Article 3.4 provides production from any part of the unit will be considered production on each tract, except for the purpose of determining royalty payments. However, Article 6.1 specifies all oil and gas produced and saved will be allocated among the tracts in accordance with the respective participation effective when the oil and gas is produced. Moreover, the amount of oil and gas allocated to each tract in the unit will be deemed for *all* purposes to have been produced on such tract. We do not find that Articles 3.4 and 6.1 irreconcilably conflict. Article 3.4 concerns activities that will hold the leases of the individual tracts by production and operations on one tract in the unit; whereas, Article 6.1 more broadly defines what is production from the "leased premises" and can be applied to royalty payments. Therefore, production allocated from any tract in the unit will constitute production from the "leased premises" on the other tracts in the unit and invoke the royalty provisions in the individual oil and gas leases.[7] The unit agreement amends individual oil and gas leases to the extent necessary to conduct uniform operations, but leaves in effect the individual lease's royalty provisions.

■■■ Samedan achieved production from a tract within the unit on June 12, 1992. Even though this production came from a tract other than Hitzelberger's, it constituted production from his "leased premises" under his lease and the unit agreement. Thus, Samedan was required to pay royalties as set forth in Paragraph 3(g) of Hitzelberger's lease to maintain its lease on Hitzelberger's tracts. Samedan failed to make two monthly royalty payments in accordance with Paragraph 3(g). Although the law does not favor forfeitures, we apply the unambiguous language of Hitzelberger's lease and the unit agreement to declare that the lease covering Hitzelberger's tracts terminated at midnight on January 31, 1993.[8] *Shindler v. Harris,* 673 S.W.2d 600, 609 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); *Pitman v. Sanditen,* 611 S.W.2d 663, 668 (Tex.Civ.App.—

---

5. We disagree with Samedan's contention that Article 6.2 simply provides a method to allocate oil to each interest owner when the tract is owned by multiple parties. The language goes far beyond a pro rata allocation among multiple owners of a single tract. This provision provides that oil and/or gas are to be distributed or accounted for "upon the *same conditions* as they would have participated and shared in the production from such Tract, or in the proceeds thereof, *pursuant to individual oil and gas lease and royalty provisions, had this agreement not been entered into, and with the same legal effect.*" (Emphasis added).

6. We find that Article 17.1 and 17.2 may be harmonized with our interpretation that the royalty provisions of Hitzelberger's lease apply during the term of the unit agreement. The term defined in Article 17.1 relates to the duration of the unit agreement itself, not the duration of an individual oil and gas lease in the unit.

7. Hitzelberger urges us to apply the statutory definition of leased premises. The Mineral Interest Pooling Act provides that "[t]he operations on and production from any portion of a unit for which a pooling order has been entered shall be considered for all purposes the conduct of the operations on and production from each separately owned tract in the pooled unit." TEX. NAT. RES.CODE ANN. § 102.053(a) (Vernon 1993). However, the Mineral Interest Pooling Act does not apply to any reservoir discovered and produced before March 8, 1961. *Id.* at § 102.003. The South Kerens field began production in 1952. Therefore, we will not apply this statutory definition.

8. We believe the forfeiture of a lease that is included in a pooled unit is especially distasteful to the law. However, we also believe that it is the lessee's responsibility to comply with lease and unit obligations to keep the lease in effect.

San Antonio 1980), *rev'd on other grounds,* 626 S.W.2d 496 (Tex.1981). We sustain Hitzelberger's second, ninth and tenth points of error. Also, we sustain the sub-points of his first point of error relating to the "production from the leased premises" as defined in his lease and the unit agreement. However, because we find both the lease and the unit agreement to be unambiguous, we overrule his eighth point of error and the sub-point of his first point of error relating to the parties' interpretation of the lease and the unit agreement.

Hitzelberger alleges in another sub-point of his first point of error, third, fourth, fifth, sixth, and seventh points of error that the trial court erred in not finding Samedan estopped by fraudulent misrepresentations from denying the effectiveness of the changes made to the unit agreement to insure his royalty provisions survived. Because the changes altered the unit agreement so that the royalty provisions of Hitzelberger's lease remained in effect, we need not address whether Samedan's alleged fraudulent misrepresentation estopped it from denying the effectiveness of the changes. Therefore, these points are overruled.

In his eleventh point of error, Hitzelberger alleges the trial court erred when it failed to declare that his tracts are committed to the unit as 7/8 working interest and 1/8 royalty interest after his lease terminated. Prior to submitting this case to the trial judge, the parties agreed to a Rule 11 agreement which provides:

> We have agreed to submit to the Judge generally the questions involving lease termination on September 1st. Once the Judge has decided whether he believes the lease terminated or not, we will then submit all remaining issues to the Judge in the same manner as the first submission, making every effort to complete additional discovery, experts, etc. within 60 days of the Court's ruling on the lease termination. The remaining issues should include the amount of money due, attorney's fees, and that type of issue that is dependent upon an initial determination that the lease is terminated or not.

We will enforce a Rule 11 agreement when the parties file a signed writing with the court as a part of the record. TEX.R. CIV. P. 11; *Padilla v. LaFrance,* 907 S.W.2d 454, 459–60 (Tex.1995); *Allen v. City of Midlothian,* 927 S.W.2d 316, 320 (Tex.App.—Waco 1996, no writ). The letter signed by the attorneys for Hitzelberger and Samedan and filed with the court constitutes a valid and enforceable Rule 11 agreement. This agreement initially limited the issues before the trial judge to whether Hitzelberger's lease terminated. If he found the lease terminated then he would consider the other issues that resulted from lease termination. Because the trial judge found that the lease did not terminate, he did not address whether Hitzelberger's tracts were committed to the unit after lease termination as per the Rule 11 agreement. Therefore, we overrule Hitzelberger's eleventh point of error. However, we remand this case to the trial court to make the post-termination decisions pursuant to the Rule 11 agreement entered into by the parties.

Because Hitzelberger's lease terminated during the primary term due to late royalty payments, the unit agreement did not amend the lease's royalty provisions, and Samedan failed to timely pay royalty payments to Hitzelberger, we find that the trial court erred as a matter of law in relying upon any of the three alternative grounds to enter judgment for Samedan. *Piazza,* 909 S.W.2d at 532; *Westech Eng.,* 835 S.W.2d at 196. We reverse and render judgment that Hitzelberger's lease terminated at midnight on January 31, 1993. We remand all other issues to the trial court for further proceedings consistent with this opinion.