**CITY OF FORT WORTH, Appellant,**

v.

**Emmitt JOHNSON, Appellee.**

**No. 10–00–359–CV.**

Court of Appeals of Texas, Waco.

April 9, 2003.

Rehearing Overruled April 30, 2003.

Theodore P. Gorski, Jr., Elizabeth T. Dierdorf, Asst. City Attorneys, Ft. Worth, for Appellant/Relator.

Jason C.N. Smith, Law Office of Art Brender, Ft. Worth, for Appellee/Respondent.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

TOM GRAY, Justice.

The City of Fort Worth terminated the employment of Emmitt Johnson. After an appeals board recommendation to reinstate him was overruled by the City manager, Johnson filed a lawsuit under the Whistleblower Act. TEX. GOV'T CODE ANN. § 554.001 *et seq.* (Vernon Supp.2003). A bench trial on the issue took place. Johnson obtained a favorable judgment, and the City appealed. We reverse and remand the cause for a new trial.

### BACKGROUND

Johnson was allegedly terminated from employment with the City over the use of a City tractor and the dumping of rough material on another employee's private property located outside the city limits.

*CAST OF CHARACTERS*

Those involved in Johnson's road to termination are listed below in descending order of rank within the City.

Bob Terrell—City manager. He had the ultimate authority to terminate or reinstate Johnson once Johnson filed an appeal.

Ramon Guajardo—assistant City manager. Terrell assigned him the duty to review the appeals board recommendation to reinstate Johnson and conduct his own investigation into the tractor/dumping incident.

Pete Nelson—a Human Resources manager over personnel. He sat in on Johnson's pre-termination hearing.

Stanley Scott—Street Services superintendent. He was in charge of the street department. He had the initial authority to terminate Johnson's employment.

Harold Jolly—assistant Street Services superintendent. He was the immediate supervisor of Willis Stafford. Jolly was also initially terminated in the tractor/dumping incident but was reinstated after his first appeal.

Willis Stafford—General Foreman, Street Services. At one time, he had been Johnson's immediate supervisor. He was not Johnson's immediate supervisor at the time Johnson's employment was initially terminated. Stafford was also terminated as a result of the tractor/dumping incident. It was Stafford's property on which the materials were dumped and where the tractor was left for his use.

Emmitt Johnson—assistant field operations supervisor, Street Services. Johnson was also an employee representative. An employee representative assists employees who have been disciplined by the City

investigate the charges against them or file and pursue an appeal of the action taken by the City. Johnson was terminated in the tractor/dumping issue and is the subject of this appeal.

Roscoe Dixson—equipment operator, Street Services. Johnson was his immediate supervisor. He was terminated, but ultimately reinstated, in the tractor/dumping incident.

*THE INCIDENT*

Willis Stafford was eligible for retirement and bought some property. The mailing address for the property listed the city as Fort Worth. But Stafford admitted that part of it was not in the city limits and that he was not a resident of Fort Worth. Stafford knew of the City's practice of dumping material on private property. Doing so saved time for the City.

Roscoe Dixson also knew of City crews dumping material on private property outside the city limits as long as a "dump release" was obtained. A dump release had to be signed by the property owner, management, and a witness.

According to Johnson, Stafford informed Johnson that he had requested to have dirt dumped by the City on his property. Stafford said he obtained a dump release from Harold Jolly, Stafford's supervisor. The dump release was admitted into evidence. The release did not give Stafford permission to use the City tractor. Johnson believed Stafford had permission from the City to dump dirt on his property once the release had been signed. The City had done this before for private citizens. This type of dumping benefitted the City because it would be near the work site and would save time. The trucks would not have to go out of their way to the landfills or other dump sites.

Harold Jolly said he signed the dump release because Stanley Scott instructed him to do so. Stafford came to Jolly requesting rough material to be dumped on his property outside the city limits. Jolly refused since Stafford was an employee. Stafford requested Jolly to ask Scott for his permission. Jolly agreed and relayed the same information to Scott that Stafford had relayed to him. Jolly told Scott why he was reluctant to give his permission for the dumping. Scott said he would ask someone at city hall. After lunch, Stafford and Scott discussed the request. Stafford told Jolly that Scott approved the dumping. Scott then also told Jolly he approved the dumping. Jolly ultimately signed the release.

According to Scott, he authorized the dumping on Stafford's property, but only if the property was in Fort Worth. He did not know Stafford's property was outside the city limits. It was against City policy to dump outside the city limits.

Stafford also had Johnson ask Scott for authorization to use a City tractor on Stafford's property. Stafford did not ask Scott because Johnson had a better relationship with Scott than he did. When Scott agreed, Johnson had him repeat his approval with Dixson present. Johnson told Dixson to deliver the tractor to Stafford's property. Dixson admitted to also using the tractor on Stafford's property to push away dirt so the trucks could dump more. He believed he was authorized to perform this work because he heard Scott tell Johnson that it was okay to take the tractor to Stafford's property. Stafford understood that Scott authorized Stafford's use of the tractor on his property as well. Stafford admitted he used the city tractor on evenings and weekends to spread the material dumped on his property. He did the work himself so that no one from the City would have to spread the material on City time.

The dumping began in January and ended in March. After a month on Stafford's property, the tractor was returned when a supervisor asked where it was. At the time of the inquiry, Johnson could not remember where the tractor was located. Dixson interjected over the radio and said it was at Stafford's property. Johnson had Dixson pick it up and take it back to the City.

Johnson, Stafford, and Dixson knew it was not unusual to leave equipment on the property of private citizens to level out the dirt and rough material dumped on private property. This would make room for more material to be dumped. Johnson calculated that some equipment had been left on private property for as long as eight months to a year. However, neither Stafford nor Johnson knew of an instance where a private citizen then used the equipment for their personal benefit.

Scott denied authorizing the use of the tractor.

Johnson knew Stafford wanted soil to be dumped on his personal property. Johnson recalled a previous situation where soil was dumped on an employee's private property. He also knew Stafford intended to use the City tractor on his property on nights and weekends.

*DISCIPLINE TAKEN*

In late June, Johnson was suspended from work. After a pre-termination hearing, Johnson's employment was terminated on July 1. Scott, along with Pete Nelson, a human resources manager, and others were present for the pre-termination hearing. Nelson agreed that it was not customary for him to be present at a pre-termination hearing. He said he was asked to fill in at Johnson's hearing. Johnson filed a grievance and appeal alleging that he had been terminated for reporting improper employment practices as an employee representative.

The City alleged that Johnson, Stafford, and Dixson violated City policy by dumping soil on Stafford's property outside the city limits and by using City equipment to spread the material. The City also alleged that the violated policy had been circulated only a few months before the dumping began. Stafford, Dixson, and Jolly were also terminated. At Jolly's pre-termination hearing, Scott denied giving him permission to sign the dump release for Stafford.

Stanley Scott was not disciplined by the City.

Ultimately, Johnson's and Stafford's terminations were upheld. Jolly and Dixson were reinstated. Johnson filed a lawsuit alleging he was retaliated against by the City for reporting violations of city ordinances as an employee representative. The City asserted that it took the action against Johnson based only on evidence not related to the alleged reports of violations of city policies. The trial court found in favor of Johnson.

**LEGAL AND FACTUAL SUFFICIENCY REVIEWS**

On appeal, the City brings twelve issues challenging the legal and factual sufficiency of the evidence to support various findings of fact made by the trial court. When both legal and factual sufficiency issues are raised, we must first examine the legal sufficiency of the evidence. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981). When considering the legal sufficiency of evidence supporting a finding, we only consider evidence and inferences tending to support the finding and we disregard all contrary evidence. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex.2000); *see also Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993). Anything more than a scintilla of evidence is legally sufficient to support the finding.

*Zimlich,* 29 S.W.3d at 69; *see also Alm v. Aluminum Co. of Am.,* 717 S.W.2d 588, 593–94 (Tex.1986).

In reviewing a factual sufficiency issue, we must weigh all of the evidence in the record. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996); *Burnett v. Motyka,* 610 S.W.2d 735, 736 (Tex.1980). Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Ortiz,* 917 S.W.2d at 772; *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We are not a fact finder. Accordingly, we may not pass upon the witnesses' credibility or substitute our judgment for that of the fact finder, even if the evidence would clearly support a different result. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998); *see also Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986).

### Good Faith Report of a Violation of Law

In issues one, five, and twelve, the City contends the evidence was both legally and factually insufficient to support the trial court's findings that: 1) Johnson reported violations of law when he represented employees in their personnel grievances and terminations (issue one); 2) Johnson's alleged reports of violations of law were made in good faith and were subjectively and objectively reasonable (issue five); and 3) Johnson made a good faith report of a violation of law when he represented Elvis Babers (issue twelve).

The Whistleblower Act (the Act) prohibits a state or local governmental agency from suspending or terminating "a public employee who in good faith reports a violation of law by the employ[er] . . . or another public employee to an appropriate law enforcement authority." TEX. GOV'T CODE ANN. § 554.002(a) (Vernon Supp.2003). A

"law" is defined as a state or federal statute, an ordinance of a local governmental entity, or a rule adopted under a statute or ordinance. *Id.,* § 54.001(1). The Act does not, however, define "good faith."

■ The City would like us to adopt its position that the Act only provides a remedy for reports of violations of law that would have an adverse impact on the public good or society in general. The City relies on a case from the Tyler Court of Appeals for this position. *See Texas Dep't of Criminal Justice v. Terrell,* 925 S.W.2d 44 (Tex.App.-Tyler 1995, no writ). In *Terrell,* the Tyler court concluded that the plaintiff had to prove that the "violation of law" he reported would have a probable adverse effect on the public good or society in general. The Tyler court relied on its review of the Act's legislative background and on Justice Doggett's concurring opinion in *Winters v. Houston Chronicle Publishing Co.,* 795 S.W.2d 723, 727 (Tex.1990).

Justice Doggett was not conducting a review of the Whistleblower Act in his concurring opinion. The Court in *Winters* was asked to extend the *Sabine Pilot*[1] exception to the at-will employment doctrine to private employees who report illegal activity. Justice Doggett was giving guidance on what a "whistleblower" in the context of a private cause of action might be.

■ Additionally, a statute is required to be interpreted, if possible, to give effect to its every word and phrase. *Lastor v. City of Hearne,* 810 S.W.2d 742, 744 (Tex. App.-Waco 1991, writ denied). No language requiring the report of a violation to be for the public good is in the Act. *Terrell,* and any other case following the language of *Winters,* adds a requirement to the Act that is simply not there and not

---

1. *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733 (Tex.1985).

required. *Cf. Wichita County v. Hart*, 917 S.W.2d 779, 785 (Tex.1996) (The legislature passed the Whistleblower Act for the 'protection of public employees who report a violation of law' and did not include language indicating that the reporting employee's motivation in and of itself should obviate the Act's protection.). Thus, we decline to follow *Terrell* and other case authority which requires the violation be reported for the public good.

 This Court has held that, even in the face of a direct challenge to whether the act reported was indeed a violation of the law, the Act protects employees who in good faith believe they are reporting a violation of law, regardless of whether their belief is correct. *Lastor*, 810 S.W.2d at 744. The key is whether the employee is reporting what the employee believes to be a violation *in good faith*. Since *Lastor*, the Texas Supreme Court has developed a two-pronged test to determine whether the employee was acting in good faith. *See Wichita County v. Hart*, 917 S.W.2d 779 (Tex.1996). The first prong is subjective; that is, the employee believed the conduct reported was a violation of the law, regardless of whether the belief is correct. *Id.* at 784–85. The second prong is objective; that is, the employee's belief is reasonable in light of their training and experience. *Wichita County*, 917 S.W.2d at 784–85.

It is in light of this test that we analyze the City's issues one, five, and twelve.

*THE EVIDENCE*

 Emmitt Johnson was an assistant field operations supervisor in the street department for the City of Fort Worth. He attended college at Prairie View A & M for two and a half years. An employer sent him to Harvard University for a semester for a trade union program. During his career, Johnson worked about 11 years for the Laborers International Union, Local 1324. He started out as an organizer and eventually became a business manager.

In 1986, Johnson went to work for the City of Fort Worth. He was also an employee representative for the Association of City Employees, an employee group which assists other employees with grievances and benefits. As an employee representative, Johnson would report alleged violations of the City's policies regarding an aggrieved employee to the employee's supervisor, the department head, the human resources department and the disciplinary appeals board because these people or entities had the authority to overturn or enforce the initial decision. He thought the appeals process was a city policy. Johnson stated that all the reports he made on behalf of employees were made in good faith. He also maintained that he strived to learn the personnel rules and regulations. Learning the rules and regulations was included in his duties as an employee representative.

Johnson would also report to the department head, human resources director, or appeals board that an employee had been punished in excess of that warranted by the infraction or that a violation of City policy had occurred. Johnson generalized his role as assisting the employee in presenting a different side of the story.

Johnson represented Roger Rodriguez in a grievance of a proposed termination. The termination arose out of the City's policy regarding operation of a city-owned vehicle. Rodriguez had been in an accident with a city-owned vehicle. It was later shown that he was not at fault, and he was suspended instead of terminated. Johnson also represented Jake Downs who was terminated for allegedly violating the city's leave of absence policy. Johnson stated he reported that the City was violating its own policies such as the em-

ployee work status policy, the disciplinary action policy, and the injury and illness policies. Downs was ultimately reinstated.

Johnson represented Eric Davis. Davis was charged with violating section H of the city's policy. Johnson reported that the City violated its disciplinary and appeals policy. Davis was reinstated. Lon Haggerty was also represented by Johnson. Haggerty received disciplinary "write-ups" for allegedly violating City policies. After reporting that the City violated its disciplinary action policy, Johnson was able to have those "write-ups" removed from Haggerty's employment record. Johnson represented Pamela Faisom. He reported that the City violated its grievance and appeal policy and its disciplinary action policy. Faisom was reinstated. Lastly, Johnson stated that he represented Elvis Babers. Johnson reported the City had violated its drug and alcohol policy in its dealings with Babers. This report was made within 90 days of the date of Johnson's termination. Babers was reinstated.

Johnson also stated that he represented Julie Mollett and Richard Ridell in some employment issues. These two employees believed some computers that the City owned had been stolen. They thought their supervisor had arranged for the computers to be taken to a private firm in a "hush-hush" manner. Johnson also thought a law was being violated and wanted to report it. He reported the potential theft to the district attorney in Tarrant County. He also reported it to the Fort Worth Police Department.

*APPLICATION*

Johnson was very familiar with unions and labor related policies. He made himself familiar with the City's personnel policies. He only represented employees when he thought policies were violated by the City. Johnson reported what he contended were violations of City policies for

at least six employees. The City reinstated the employees. Johnson also reported two employees' beliefs that a theft of computers had occurred. Thus, more than a scintilla of evidence exists that: 1) Johnson reported violations of laws when he represented City employees, including Elvis Babers, in their grievance/appeal procedures; 2) Johnson reported a violation of law when he reported a possible theft of computers to the police and the district attorney; 3) Johnson subjectively believed laws, as defined by the Act, were violated when the City did not follow their own procedures and when the computers were transferred to a private firm; and 4) in light of his training and experience, Johnson's belief that the City violated laws was objectively reasonable. Additionally, in light of the entire record, the findings by the trial court are not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust.

Issues one, five, and twelve are overruled.

CAUSAL CONNECTION

In issues two, three, four, six, and seven, the City contends the evidence is both legally and factually insufficient to support the trial court's findings that Johnson's termination was caused by: 1) his representation of city employees (issues two and seven); 2) Nelson's negative attitude toward Johnson and his representation of city employees (issue six); 3) his reporting of a violation of the city's drug abuse policy when he represented Elvis Babers (issue three); and 4) his helping two city employees, Julie Mollett and Richard Ridell, to report a possible theft and misappropriation of computers (issue four).

A public employee suing under the Whistleblower Act must prove by a preponderance of the evidence that he suf-

fered discriminatory or retaliatory conduct by the employer that would not have occurred when it did if the employee had not reported the violation of law. *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000); *Department of Human Servs. v. Hinds*, 904 S.W.2d 629, 633 (Tex.1995). In other words, the employee must establish a "but for" causal connection between the reported violation of law and the employer's actions. *Texas Natural Resource Conservation Comm'n v. McDill*, 914 S.W.2d 718, 723 (Tex.App.-Austin 1996, no writ.). The employee need not establish, however, that the reported violation of law was the sole cause of the employer's action. *Hinds*, 904 S.W.2d at 635.

▆▆▆ The Act allows for a presumption of the causal connection if the employee is terminated or suspended not later than 90 days after the reported violation of law. TEX. GOV'T CODE ANN. § 554.004(a) (Vernon Supp.2003). That presumption is rebuttable. *Id.* The presumption does not shift the burden of proof and stands only in the absence of evidence to the contrary. *McDill*, 914 S.W.2d at 723; *Garza v. City of Mission*, 684 S.W.2d 148, 151–52 (Tex. App.-Corpus Christi 1984, writ dism'd). Once sufficient evidence is produced to support a finding of the non-existence of the causal connection between the termination or suspension and the reported violation of law, the case then proceeds as if no presumption ever existed. *McDill*, 914 S.W.2d at 724; *Garza*, 684 S.W.2d at 152. There is no presumption aiding the employee after the presumption is rebutted by positive evidence to the contrary. *Texas A & M University v. Chambers*, 31 S.W.3d 780, 784 (Tex.App.-Austin 2000, pet. denied).

▆▆▆ If no presumption is raised or the presumption is rebutted, the employee must produce some evidence to support a causal connection between the reports made and the retaliatory conduct by the employer. *Zimlich*, 29 S.W.3d at 68. A factfinder may not infer causation without some evidence to support such a finding. *Id.* Circumstantial evidence may be sufficient to establish a causal connection. *Id.* at 69 (citing *Continental Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996)). Such circumstantial evidence includes: 1) knowledge of the employee having reported a violation of law; 2) expression of a negative attitude toward the employee's report of a violation of law; 3) failure to adhere to established company policies regarding employment decisions; 4) discriminatory treatment in comparison to similarly situated employees; and 5) evidence that the stated reason for the adverse employment action was false. *Id.* But, evidence that an adverse employment action was preceded by a superior's negative attitude toward an employee's reported violation of law is not enough, standing alone, to show a causal connection between the two events; there must be more. *Id.*

### PRESUMPTION

▆▆▆ It is uncontested by the parties that Johnson represented Elvis Babers in a grievance/appeal proceeding not more than 90 days prior to Johnson's termination. We have already overruled the City's argument that Johnson did not report a violation of law when he represented Babers. Thus, Johnson has the benefit of a presumption of a causal connection between his discharge and the City's misconduct relating to Babers. Any other reports of violations made by Johnson were not within the 90 day period for application of the presumption.

### PRESUMPTION REBUTTED?

The City presented evidence through Bob Terrell, the city manager, that John-

son was terminated because he improperly allowed Stafford to have "special privileges;" *i.e.* Johnson had the City tractor delivered and left at Stafford's property so that Stafford could use it after hours and on weekends. Thus, the City presented sufficient evidence to rebut the presumption of a causal connection by Johnson's termination within 90 days of representing Elvis Babers.

*PROOF*

Once the presumption is rebutted, Johnson must produce evidence to prove a causal connection between the reported violation of law while representing Babers and his discharge by the City. Because there was no presumption of a causal connection between Johnson's reported violation of law when he represented other employees and his discharge, Johnson must also produce evidence to prove the causal connection to those reported violations made while assisting them in the review process. Johnson need only prove a causal connection between one of the reported violations of law and his termination. We will first discuss generally the evidence in the record and then apply the law to that evidence.

In reviewing the record for evidence of this causal connection, we are limited to the evidence that Terrell, the person who ultimately made the decision to terminate Johnson, knew about the reported violations of law. The dissenting opinion takes issue with this narrow focus of our search of the record for evidence. The dissent fails to focus only on the knowledge of the person who made the decision to terminate Johnson and reasonable inferences that could be drawn from what that person knew about reported violations of "law" and not the person's more general knowledge, if any, of Johnson's position as an employee representative.

In recounting the evidence, it is not that we accept or reject Terrell's denial of knowledge of such violations. Rather, we simply discuss all the evidence of relevant knowledge that is in the record, as we are required to do, and explain in the "Application" section of this opinion why we have determined that it is factually insufficient to establish the causal connection.

*Knowledge*

The first circumstantial evidence factor involves whether the City knew of Johnson's report regarding Babers and other employees [2] when it upheld Johnson's termination. In particular, the employee must show that the person who ultimately made the decision to fire the employee knew of the reported violation of law made by the employee. When an employee appeals a decision to terminate, the city manager, Terrell, makes the final decision to follow or overturn the appeals board recommendation. If an employee had a hearing before the disciplinary appeals board, the board would send Terrell its recommendation. Terrell testified he would not know who would have been the employee's representative at the hearing.

Scott initially terminated Johnson's employment, and Johnson appealed to the appeals board. The board recommended that Johnson be reinstated. Although neither the board nor Johnson requested any further investigation, Terrell asked Ramon Guajardo to conduct an investigation. Guajardo reviewed the appeals board recommendation and, in turn, recommended that Johnson's employment should be terminated because Johnson delivered the tractor so that Stafford could use it on nights and weekends. Terrell followed

---

**2.** The other employees specifically mentioned by Johnson were: Roger Rodriguez, Jake Downs, Eric Davis, Lon Haggerty, and Pamela Faisom.

Guajardo's recommendation. Guajardo did not relay any information to Terrell that Johnson thought his termination was due to his representation of city employees.

Johnson testified that in May of 1993, the president of the Association for City Employees wrote a letter to the city manager, Bob Terrell, stating that Johnson would represent city employees who requested representation at grievance meetings and pre-termination hearings. Johnson watched the president compose the letter. Later, at an Association meeting, Terrell acknowledged the receipt of that letter. Johnson was present at the meeting. In June of 1993, Terrell composed a letter concurring with the appeals board's recommendation on an employee termination case. The letter was carbon copied to Johnson. Then, in September of 1993, Johnson composed a letter to Terrell to inform him that he had been retaliated against since becoming an employee representative. Johnson believed Terrell was aware that he was reporting violations of City laws because the Association would meet with Terrell in person and would discuss issues that were occurring at the time. He also said the Association would send copies of correspondence to Terrell.

When Terrell testified, he denied knowing that Johnson was an employee representative for the City's employees. Terrell was shown two letters addressed to him which indicated Johnson was the employee representative for grievance matters. These letters were admitted into evidence. Terrell was also shown a letter signed by Terrell regarding the personnel commission's findings on an employee's appeal of termination. Terrell acknowledged that the letter indicated it was carbon copied to Johnson. That letter was also admitted into evidence. These three letters were

sent to or by Terrell 5 years prior to Johnson's employment termination. He did not recall any of the letters when he upheld Johnson's employment termination. Terrell testified he did not know that Johnson was an employee representative for Elvis Babers when he decided to terminate Johnson's employment. Johnson did not offer evidence to controvert this statement.

Terrell acknowledged that he may have met Johnson at an employee meeting, but did not remember Johnson when he made the decision to terminate Johnson's employment. He did not recall ever having a discussion with Johnson. He would not have discussed certain employees' terminations with Johnson because he was the last person to review an employee's appeal.

*Negative Attitude*

The second factor involves the expression of a negative attitude toward Johnson's report of violations by the City against Babers. Johnson testified that Stanley Scott informed him that the City, particularly Pete Nelson, a human resources personnel director, was not pleased with Johnson's reporting of policy violations regarding employees Johnson represented. Because Johnson was winning grievances, Scott told him that Nelson was upset and obsessed with "getting rid of" him. The last time Scott and Johnson discussed Nelson's feelings was in conjunction with Elvis Babers' first grievance.[3] Scott did not recall ever telling Johnson that Nelson was upset because Johnson won grievance hearings for city employees. A taped conversation between Scott and Johnson which was introduced into evidence indicated that Nelson wanted Johnson off the employee association.

---

**3.** This is not the grievance proceeding which triggered the causal connection presumption.

Nelson testified that prior to 1996, he had the opportunity to meet with Johnson in his capacity as an employee representative. Nelson did not meet with Johnson in connection with Johnson's representation of Elvis Babers. He stated he had no animosity toward Johnson about Johnson's representation of city employees.

Terrell acknowledged that he knew Pete Nelson and worked with him on a regular basis. He denied, however, that Nelson mentioned to him that Johnson, as an employee representative, was winning too many grievance hearings. Terrell stated that he did not recall the letters sent to him regarding Johnson's election as an employee representative when he decided to terminate Johnson's employment. Terrell also testified that he did not know that Johnson represented Babers when Terrell decided to terminate Johnson's employment.

*Company Policy*

The third factor involves the failure to adhere to established policies regarding employment decisions. Johnson stated that the City usually gave verbal warnings, then reprimands, then reductions in pay, and finally suspensions prior to termination. The City's disciplinary policy provides that "Disciplinary action is to be administered in an equitable and consistent manner." According to Terrell and the policy, it is possible for an employee with no discipline problems to have his employment terminated by the City. Progressive steps of discipline are applied only when deemed appropriate and reasonable. The employee's violation of the rules can be so egregious that termination is appropriate. Terrell was not aware of Johnson's disciplinary record prior to his decision to terminate Johnson's employment. Based on the circumstances, he concluded that he would have terminated Johnson's employment even if he had

known that Johnson had no prior discipline sanctions within the last five years on his record.

*Discriminatory Treatment*

The fourth factor involves discriminatory treatment in comparison to similarly situated employees. Originally, Johnson, Stafford, Jolly and Dixson were terminated for the dumping/tractor incident. Jolly was reinstated after the first level appeal. Dixson was reinstated by Terrell at the last level of appeal. Johnson and Stafford were terminated. There was conflicting testimony about whether Scott gave permission to dump the material on Stafford's property which was outside the city limits or to use the tractor on Stafford's property. Jolly said Scott authorized the dumping of the rough material. Scott agreed that he gave permission to dump the material but did not know the property was outside the city limits and would not have given his permission if he had known the property was outside the city limits. Stafford, Johnson and Dixson stated that Scott authorized the use of the tractor by Stafford on his property. Scott denied he gave his permission. Scott was never disciplined. Dixson also testified, and the appeals board found, that other city employees transported, dumped and spread material on Stafford's property. None were disciplined.

*Stated Reason—False*

The last factor involves whether evidence exists that the stated reason for the adverse employment action was false. Stanley Scott testified that he fired Johnson for theft and misuse of City property. In an interoffice memo from Scott, Johnson was informed that he would be on administrative leave with pay following allegations of inappropriate behavior. In his notice of pre-termination hearing, Scott informed Johnson that he was charged with violating written departmental regulations

regarding performance of duties. Specifically, Scott charged Johnson with violating a written policy dated November 4, 1996, regarding the prohibition of work being performed outside the city limits. Several supervisors in the street department testified that at the time of the dumping/tractor incident, they had not seen the new policy.

In its support of the initial determination to terminate Johnson, the City Attorney's office summarized the allegations against Johnson as follows:

> The three employees violated Department procedure by dumping soil on Mr. Stafford's private property, which was located about three miles outside City limits, and using City equipment to spread the soil. The soil dumping and spreading occurred over a period of at least four months. Mr. Johnson and Mr. Dixon (sic) assisted Mr. Stafford as he personally benefited (sic) from the soil and the unauthorized use of the City equipment. This practice was in direct violation of a department policy that had been circulated only two months prior to the initial dumping and spreading of the soil.

The appeals board found: 1) the department policy in question was not circulated to everyone who needed to know; 2) it was not reasonable to expect anyone other than Stafford to know his property was outside the city limits; 3) testimony did not support the City's assertion that Stafford received top-grade soil; 4) if the act of dumping is, by itself, grounds for termination, others who also transported and dumped material on Stafford's property should be terminated; 5) since some type of permission was granted for the use of the tractor, discipline of those who requested permission is not reasonable unless those who gave permission were also disciplined; and 6) the City has been inconsistent in handling the issue when one employee is reinstated due to the questionable veracity of Scott and others are not. The board discounted Johnson's claim that previous allegations of "loan sharking" played into the determination of termination. The board recommended that Johnson be reinstated.

Bob Terrell had an assistant review the board's findings and make a recommendation. The assistant recommended that Johnson be terminated because Johnson had the tractor delivered to Stafford to use on weekends and after work. Having control of the tractor, the assistant concluded that Johnson allowed Stafford to have special privileges. The recommendation was that Johnson's termination be upheld. Terrell followed that recommendation. Even though city equipment had been left on private property for crews to use the next day, neither Johnson nor Stafford could recall a situation where an employee or a private citizen used the equipment after hours or on weekends.

*APPLICATION*

Because Johnson elected to appeal the initial determination by Scott to terminate his employment, Terrell had the final say in deciding whether to uphold the termination or reinstate Johnson. Thus, we must focus on what the evidence is that may be used to infer a causal connection between a report of a violation of law by Johnson, not just his general work as an employee representative, and his termination.

*Babers*

Terrell did not know that Johnson was the employee representative of Babers when he made the decision to uphold Johnson's termination. Further, Terrell harbored no negative attitude toward Johnson due to his representation of Babers. The City's disciplinary policy allowed for the non-application of progressive discipline

when appropriate and reasonable, and Terrell decided to terminate Johnson. He would have done so even if he had known Johnson had no disciplinary actions taken against him within the last five years. Terrell based his decision of termination on the fact that Johnson transported the tractor to Stafford for his use on weekends and after hours. There was no evidence presented that this particular reason for termination was false. By the time the issue reached Terrell, the allegations of "loan sharking" and improper dumping had vanished. Thus, four of the five circumstantial evidence factors were not met in this case regarding Johnson's representation of Babers.

However, there was evidence that at least one similarly situated employee was not treated the same as Johnson. The only people other than Johnson who would have had control over the location of the tractor were Stafford and Scott. Stafford was terminated. Scott received no disciplinary action at all.

■ Based on circumstantial evidence, there was at least some evidence, more than a scintilla, of a causal connection between Johnson's termination and his alleged reporting of a violation of the City's drug abuse policy when Johnson represented Elvis Babers. There is legally sufficient evidence to support the trial court's finding based on this inference.

■ But, is the evidence factually sufficient to support the same finding by the trial court? We know that evidence of a negative attitude, standing alone, is not enough. Is evidence that one supervisor was not disciplined factually sufficient to establish a causal connection? In this situation, we think it is not. The three employees who were involved with the delivery and use of the tractor were disciplined. All three, Johnson, Dixson, and Stafford, were terminated. Dixson was ultimately

reinstated but placed on probation for 6 months. Johnson and Stafford were supervisors. They both knew Stafford planned to use the tractor after hours and on weekends. Scott was the superior of all the employees disciplined by the City. While he may have given permission to use the tractor, nothing in the record supports the inference that he had the same level of involvement in the incident as did Johnson and Stafford. He did not deliver the tractor to Stafford's property. The record does not support the inference that Scott knew Stafford would use the tractor on nights and weekends. The great weight and preponderance of the evidence reveals that only Johnson and Stafford were similarly situated employees, and they both were fired. We hold that the evidence is factually insufficient to support the trial court's finding that Johnson's termination was caused by his report of the City's drug abuse policy in connection with Johnson's representation of Babers.

The City's third issue is sustained, in part.

*The Others*

■ Terrell knew, at one point, that Johnson was an employee representative. But, no evidence was produced by Johnson that Terrell either knew that Johnson was the employee representative of these particular employees or that he made reports of violations of laws while he represented these employees. Further, there is no evidence in the record that Terrell harbored a negative attitude toward Johnson because he reported violations of law when he represented these other employees. There is no different or additional testimony regarding the remaining circumstantial evidence factors than was discussed in the application section in Babers's case. Thus, the analysis and result regarding the other employees are the same. The evidence is

legally sufficient to support the trial court's finding that Johnson's termination was caused by reporting violations of law in connection with his representation of city employees but is factually insufficient to support that same finding.

The City's second and seventh issues are sustained, in part.

*Computer Theft*

There is no evidence in the record that Terrell knew anything about Johnson's report of possible computer theft or that he had a negative attitude toward Johnson because of that report. Again, there is no different testimony regarding the remaining circumstantial evidence factors. Thus, the analysis and result are the same. The evidence is legally sufficient to support the trial court's finding that Johnson's termination was caused by reporting violations of law in connection with his representation of city employees but is factually insufficient to support that same finding.

The City's fourth issue is sustained, in part.

*Pete Nelson*

■ The trial court's finding that Pete Nelson's negative attitude caused Johnson's termination has no bearing on the outcome of this case. Nelson did not have the ultimate authority to either terminate or reinstate Johnson. Thus, it is unnecessary for us to make a determination as to whether this evidence is legally or factually insufficient to support the trial court's finding.

#### CONCLUSION [4]

Because the evidence is factually insufficient to support the trial court. findings

that Johnson's termination was caused by reporting violations of law in connection with his representation of City employees, reporting a violation of the City's drug abuse policy when he represented Elvis Babers, and helping two City employees to report a possible theft and misappropriation of computers, the findings cannot stand. Our disposition of these issues makes it unnecessary to review the legal and factual sufficiency of the trial court's findings regarding damages for mental anguish; witness tampering; the propriety of the injunction; and the City's failure to post a notice in the workplace.

Having found error in the trial court's judgment, this cause is reversed and remanded to the trial court for further proceedings consistent with this opinion.

Justice VANCE dissenting.

BILL VANCE, Justice, dissenting.

Agreeing with the majority in part, my dissent focuses on the holding that the evidence is factually insufficient to support the trial judge's findings that a causal connection existed between Johnson's reports of violations of law and the City's decision to terminate his employment.

#### CITY'S CONCESSION AT ORAL ARGUMENT

We heard oral argument on January 18, 2002. On February 1, Johnson filed a post-submission letter-brief, which states:

> During the City's rebuttal argument on January 18, 2002 before the Court, the attorney for the City of Fort Worth

---

4. Well after oral argument, the City presented another brief. Although the brief was filed because it was characterized as a post-submission brief, it is actually a supplemental brief because the City raised a new issue regarding whether Johnson's report of a vio-

lation of law was made to an appropriate law enforcement agency. We decline to address the issue raised for the first time in this post-submission supplemental brief. *See* 10TH TEX. APP. (WACO) LOC. R. 13(e).

conceded that this is probably not a causal link case because there was arguably two of the five types of evidence required by the Texas Supreme Court under the Texas Whistleblower Act in *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex.2000). Instead, counsel for City of Fort Worth said that there was no evidence or insufficient evidence that Plaintiff Johnson made a report and that report was made in good faith.

Later in the letter-brief, Johnson asserts:

Again, during oral argument, the City conceded this was not a causal link case because Plaintiff Johnson had arguably shown at least two of the five types of evidence that can support a finding that a report is causally linked to a report of a violation of law. However, the record contains evidence of all five types of evidence that may support a causal link.

The City filed a post-submission brief on February 5, which does not controvert Johnson's characterization of the City's position at oral argument. Its brief first states, "Johnson's letter brief requires only a brief rebuttal." It then argues that (a) Johnson's reports of violations of City policy are not "violations of law" under the Whistleblower Act and (b) his reports were not made in good faith.

I join the majority in rejecting the City's primary arguments in its appeal, *i.e.*, issues one, five, and twelve concerning good faith reports of violations of law. Because we agree about those issues and because the City has conceded that its arguments about a causal connection are not well-founded, I would reject its issues attacking the trial judge's liability findings. Furthermore, an analysis of the evidence demonstrates that those finding are supported by factually-sufficient evidence.

## THE TERMINATION PROCESS

Stanley Scott, Superintendent of the Street, Light & Signal Department, sent Sonny Stafford, Emmitt Johnson, and Roscoe Dixson a notice dated June 5, 1997, that they were being placed on "administrative leave with pay" pending investigation of "allegations of inappropriate behavior" involving dumping of material on Stafford's personally-owned property, which was outside the city limits, and use of a city-owned tractor on his property. On June 24, Scott notified Johnson that the City was considering termination of his employment. After a "pre-termination hearing" held on July 1, Scott immediately terminated Johnson's employment in a letter that acknowledged that Johnson had defended himself on the basis that (1) that he was being retaliated against because of his involvement with the Association of City Employees (A.C.E.) and (2) permission had been granted for dumping of city material on Stafford's property. On July 9, Johnson filed a "Grievance/Appeal Report Form" designated by him as an "appeal" and a "discrimination complaint" stating that he was "following orders" in the approved dumping of material on Stafford's property, that he was terminated for "reporting improper employment decisions as a representative of A.C.E.," and that the use of the tractor had been authorized by Scott, who was not disciplined. Hugo Malanga, Director of the Transportation and Public Works Department, did the "step 1 review" of the termination appeal on August 27 and told Johnson in a letter that he did not "find sufficient evidence to overturn the recommendation of termination by Stanley Scott, Street Superintendent." Johnson elected to bypass step 2 of the appeal process (review by the Human Resources Department) and appealed directly to the Disciplinary Appeals Board (step 3).

Dixson and Stafford had also appealed to the Board. On September 11, the City Attorney sent the Board a "position statement" which posed three questions as to each employee: (1) were the facts of the tractor-dumping incident true?; (2) did the City follow its policy in the disciplinary action taken?; and (3) was termination warranted under the circumstances? The board, composed of three residents of Fort Worth who were not city employees, held a joint three-day open hearing of the three employees' appeals of the decisions to terminate their employment. The board made three sets of findings, stated three "additional considerations" to justify its recommendation, and recommended to the City Manager that the decision to terminate employment be reversed as to each of the three employees. It found:

1. A revised policy regarding dumping of dirt on private citizens' property had not been distributed to everyone who needed to know; a new "dump release" was not issued along with the revised policy; use of an old form was not sufficient grounds for termination;

2. The fact that Stafford's property was located outside the city limits should have been known to him and could be a ground for disciplining him; it was not a proper basis to discipline Dixson or Johnson;

3. The City's allegation that top-soil was delivered to Stafford's property, rather than debris, was not supported by the testimony;

4. If the dumping were grounds for termination, several other employees who also transported and dumped material there should be terminated;

5. Use of the tractor could be grounds for termination but for Scott's giving permission for its use; the board believes that such permission was

given by Scott; it is not reasonable to discipline employees who asked for permission unless the individual who granted permission is also disciplined;

6. The City acted inconsistently in handling the issue; Jolly was reinstated because of his testimony about permission from Scott, whereas the other three were terminated because of Scott's denial of permission;

7. Although the City reserves the right to suspend "disciplinary sequence," the explanation for doing so in these three cases was not justified;

8. Termination was not warranted as to Dixson, Johnson, or Stafford.

Among the "additional considerations" stated by the Board was its view of a tape recorded conversation Johnson had had with Scott, which it found "impossible to ignore." The Board expressed concern about the circumstances under which it was made, i.e., secretly by Johnson, but concluded from the tape that Scott had given his permission, in spite of his denials. The Board also observed that in the conversation, Scott made statements like: (a) "the white boys are out to get you" and (b) Pete Nelson, the Human Relations manager, was "obsessed to get rid of Emmitt Johnson."

Based on its findings, the Board concluded, in response to the City Attorney's three inquiries, that: (1) although the dumping occurred and the tractor was used, the policy was not properly distributed, the employees other than Stafford had no reason to know that his property was outside the City, only debris was dumped, other employees transported material there, Scott gave "some type of permission," and the City's position was inconsistent in its handling of the issue; (2) although the City had the right to suspend the disciplinary sequence, it was not justi-

fied in this instance; and (3) termination was not warranted.

On December 23, 1998, Rufino Mendoza, Human Resources Manager, sent Dixson, Johnson, and Stafford a copy of the Board's findings and recommendations and a copy of City Manager Bob Terrell's decision to (a) follow the Board's recommendation to reverse the termination of Dixson's employment but (b) reject the Board's recommendations with respect to Johnson and Stafford, whose terminations were upheld. The letter also included a copy of a Memorandum from Ramón Guajardo, an Assistant City Manager, which formed the basis for Terrell's decision.

## THE TRIAL JUDGE'S FINDINGS

To fully understand this case, one must know what facts were found. Findings of fact made by the trial judge, sitting as the factfinder, enjoy the same status as findings of a jury. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991). They are subject to attack on grounds of legal and factual insufficiency, the same as a jury's findings. *Hitzelberger v. Samedan Oil Corp.,* 948 S.W.2d 497, 503 (Tex. App.-Waco 1997, pet. denied) ("In evaluating a claim regarding sufficiency of the evidence, the same standard is used for a bench trial as for a jury trial.") (citing *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996)). Unchallenged findings of fact are binding on a reviewing court unless the contrary is established as a matter of law or there is no evidence to support the findings. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696 (Tex.1986).

The judge made these findings of fact (grouped for ease of reference) about Johnson's work history:

- Johnson, an eleven-year employee of the City, had received above-average employment evaluations and, for the five years preceding his termination, had not been reprimanded, put on probation, or suspended (Findings 1, 2 and 3);

- As a member of the Association of City Employees, an organization that sought to promote and protect the interests and rights of the City's employees, Johnson acted as the "employee representative" with regard to employee disciplinary actions proposed by the City (Findings 4, 5, 6, and 7).

The judge made these findings concerning reports of violations of law:

- In his capacity as employee representative, Johnson reported violations by the City of its own policies to those in the City responsible for administering those policies (Findings 8, 11 and an un-numbered Finding between Findings 23 and 24);

- The policies about which he reported violations were adopted pursuant to the City Charter, City Code, and City Ordinances (Findings 9 and 21);

- The directors of the departments of the City and the Disciplinary Appeals Board of the City to whom the reports were made were "law enforcement agencies" (Finding 10); [1]

- Johnson reported violations of the City's policies to the appropriate person in the City in the following specific instances:

 1. Violation of policies regarding the operation of City-owned vehicles and the disciplinary action in the case of Roger Rodriguez (Finding 14);

 2. Violation of policies regarding employee work status resulting from injury and illness and the disci-

---

1. Probably a conclusion of law, rather than a fact finding.

plinary action in the case of Jay Daniels (Finding 15);

3. Violation of the disciplinary action policy in the case of Eric Davis (Finding 16);

4. Violation of the disciplinary action policy in the case of Lon Hagedy (Finding 17);

5. Violation of the disciplinary action policy in the case of Pamela Faison (Finding 18); and

6. Violation of the Personnel Regulations of the City when two supervisors (of employees against whom discipline was instituted) stole property belonging to the City (Finding 22), reported to the City's Human Resources Department (Finding 24);

● Johnson reported a violation of state law when the two supervisors stole property belonging to the City (Finding 22), the report being made to the Tarrant County District Attorney's Office and the Fort Worth Police Department (Finding 24);

● Johnson reported violations of the policy regarding alcohol and substance abuse in the workplace, the policy regarding a drugfree workplace, the disciplinary action policy, and the employee assistance policy, contained in the City's Personnel Regulations, in the case of Elvis Babers (Finding 19);

● The drugfree workplace policy, the alcohol and substance abuse policy, and the employee assistance policy were adopted by the City under federal law (Finding 20);

● The report concerning Babers was made within ninety days prior to Johnson's termination and the City did not rebut the presumption that he was terminated because of this report (Finding 23);

● All of these reports were made by Johnson in good faith and were subjectively and objectively reasonable (Findings 25 and 26).

These findings were made concerning the termination of employment:

● Stanley Scott authorized the use of the City's tractor on Sonny Stafford's property (Finding 27); Scott knew of and authorized the dumping on Stafford's property (Finding 46);

● Although Johnson was terminated because of the tractor, Scott was not disciplined in any manner (Finding 28);

● Harold Jolly, another employee involved in the tractor incident, was reinstated with full back pay; Johnson was not (Finding 30);

● Although Stafford had obtained the "dump release" required by City policy for the dumping of rough materials on his property, he, Jolly, Johnson, and Dixson were terminated; the release was signed by Jolly (Finding 31);

● Jolly obtained permission from Scott to allow the dumping (Finding 32);

● Scott was aware of Johnson's representation of City employees in the grievance and appeal process (Finding 33);

● Scott and Pete Nelson, a supervisor in the City's Human Resources Department, attended Johnson's pre-termination meeting; they made the decision to terminate Johnson after that meeting; Nelson was upset with Johnson's reporting of violations of the City's policies; Johnson's reports caused results in disciplinary proceedings that ran contrary to Nelson's desires (Finding 34);

● Other supervisors in Johnson's department (Johnson was an assistant field operations supervisor) were not

disciplined for participating in the dumping on Stafford's property (Finding 35);

- After a three-day hearing, the City's Disciplinary Appeals Board found that: Johnson's termination was not warranted, Scott lied, Scott authorized the use of the tractor on Stafford's property, and Scott was not disciplined for authorizing it; (the trial judge agreed with the Board's findings of fact) (Finding 36);
- The City did not follow its own policy of progressive discipline (oral warnings followed by written warnings, followed by suspension and/or probation) prior to terminating Johnson (Finding 37);
- Neither the City nor Bob Terrell, the City Manager, terminated employees who engaged in allegedly more egregious activity than that Johnson engaged in, including instances in which an employee was accused of paving his driveway with City equipment and in which a supervisor allowed an exotic dancer to attend a retirement party on City property (Finding 38);
- Terrell knew about Johnson's reports of violations of law prior to deciding to terminate his employment (Findings 12 and 39);
- Terrell failed to discipline Scott, who authorized use of the tractor for which Johnson was terminated (Finding 40);
- Each of the reported violations constituted a motivating factor, separate and apart from each other report, for Johnson's termination (Finding 41);
- Other City employees who had engaged in more egregious conduct than Johnson were not terminated, but were given oral/written warnings or probation or no discipline (Finding 45);

- All the stated reasons for the City's termination of Johnson's employment were false (Finding 47).

## AGREEMENT WITH MAJORITY

I begin by stating again that I agree with the majority that the Whistleblower Act does not contain language requiring that a reported violation be for the "public good" to be the basis for a suit under the act. Majority Opinion, op. at 160. I further agree that the evidence is legally and factually sufficient to support the trial judge's findings concerning Johnson's good faith reports of what he reasonably believed, subjectively and objectively, to be violations of state law and the City's own policies. *Id.* at 163. Finally, I agree that the evidence is legally sufficient to support the judge's findings concerning a causal connection between the reported violations and Johnson's termination. Thus, I agree that the City's issues one, five, and twelve should be overruled along with the legal-sufficiency challenges to the causation findings included in issues two, three, four, six, and seven.

## CAUSAL CONNECTION—FACTUAL SUFFICIENCY

I part company with the majority on the factual sufficiency review of the issues concerning causation. Johnson had the burden of proving a causal connection between one or more of the reported violations and his termination, and the trial court found as a fact that a connection existed in each instance.

STANDARDS OF REVIEW

Because the City attacks the factual sufficiency of the evidence to support findings adverse to it upon which Johnson had the burden of proof at trial, we should set aside a finding only if a review of all the evidence, both for and against it, demonstrates that the finding is clearly wrong

and unjust. *Cain v. Bain,* 709 S.W.2d 175, 175 (Tex.1986); *Checker Bag Co. v. Washington,* 27 S.W.3d 625, 633 (Tex.App.-Waco 2000, pet. denied). That could occur because the finding was based on weak or insufficient evidence or because Johnson's proof, although adequate if taken alone, is overwhelmed by the City's contrary proof. *See Checker Bag,* 27 S.W.3d at 633 (citing William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX. L.REV. 515, 519 n. 11 (1991)). We are not a factfinder. *Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998). We may not pass upon the witnesses' credibility or substitute our judgment for that of the factfinder, even if the evidence would clearly support a different result. *See id.*

In reversing for factual insufficiency, a reviewing court must detail the evidence relevant to the issue in consideration and state why it is factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias. *Jaffe Aircraft Corp. v. Carr,* 867 S.W.2d 27, 28 (Tex. 1993); *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986).

In a Whistleblower Act case, a causal link between the report of illegal conduct and the adverse employment action may be established by circumstantial evidence. *Zimlich,* 29 S.W.3d at 69 (citing *Continental Coffee Prod. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996)). Some evidence must exist from which the factfinder could reasonably infer that discrimination was a factor in the decision process. *Id.* Otherwise, a finding would rest only on speculation. *Id.* at 70.

The majority correctly outlines the types of circumstantial evidence that the Texas Supreme Court has said will suffice: (1) knowledge of the report of illegal conduct, (2) expression of a negative attitude toward the employee's report of the conduct, (3) failure to adhere to established company policies regarding employment decisions, (4) discriminatory treatment in comparison to similarly situated employees, and (5) evidence that the stated reason for the adverse employment action was false. *Id.* at 69. The Court noted that a superior's negative attitude, standing alone, would be insufficient to show a causal connection. *Id.*

ANALYZING THE FACTORS

My disagreement with the majority is in the way it analyzes the *Zimlich* factors. I will address them in order, but before beginning that analysis, I point out that the majority focuses on the City Manager, Bob Terrell, because it says he made the "ultimate" decision. No authority is cited to support such a limitation. In fact, if the majority is correct in this analysis, every public entity subject to the Whistleblower Act would be well advised to create a position to which it assigns the ultimate authority in disciplinary matters, then insulate that official from all other knowledge about employees. In that way, the employee would be unable to show, in the majority's words, "that the person who ultimately made the decision to fire the employee knew of the reported violation of law made by the employee." The "ultimate decision-maker" could always testify that he or she had no knowledge of any reports of a violation of law by the employee but acted strictly on what he or she knew about the particular charge that led to discipline. That cannot be the correct rule of law.

The City's brief admits at page 10, and it is undisputed: "Scott terminated Johnson's employment" for his involvement in the tractor-dumping incident. The majority states: "Scott initially terminated Johnson's employment" but rejects an analysis

of the circumstantial evidence of his motive. Terrell's role was limited to a review of the recommendation of the Disciplinary Appeals Board, which he rejected in deciding to uphold Scott's action terminating Johnson's employment. But the majority finds Terrell's decision dispositive, contrary to precedent.

In *Zimlich,* our Supreme Court discusses the factors in relation to the "decision-makers," *i.e.,* was there evidence that the decision-maker or decision-makers knew about reports, expressed a negative attitude, failed to adhere to established policy, or stated a reason for the adverse employment action that was false. *Id.* at 70. The Court discusses the "conduit" theory in which one supervisor makes a recommendation about an employee to another innocent supervisor who acts on the recommendation without exercising independent judgment.[2] *See id.* Here, the "decision-makers" were Scott and Terrell. Scott made the initial decision and, as I will show, knew about Johnson's reports, had a negative attitude about Johnson, failed to follow the progressive disciplinary policy without justifying it, and falsely stated that he had not authorized the dumping and use of the tractor. The Disciplinary Appeals Board, although not a "decision-maker," held a hearing, found that the tractor-dumping charges were not justified, found that the City did not follow its own policies, and concluded that termination was not warranted. Those findings were communicated to Terrell, the other decision-maker, who rejected them. It is undisputed that Terrell made no independent inquiry, and the inquiry that he caused to be made did not address all the issues.

The majority simply relies on Terrell's testimony that he had no knowledge of Johnson's reports. In doing so, it ignores Scott's role and the information communicated to Terrell by the Board's written report. It does not discuss the "conduit" theory at all.

I now turn to the analysis.

Although no one with the City has admitted that there was a connection between Johnson's reports and his termination, the trial judge assessed the credibility of the witnesses and believed that sufficient circumstantial evidence existed to justify a finding that a causal connection existed. Our factual-sufficiency inquiry, then, should be whether the findings under the five factors are based on evidence that is too weak or whether Johnson's proof, although adequate if taken alone, is overwhelmed by the City's contrary proof. *See Checker Bag,* 27 S.W.3d at 633.

*Knowledge of the Report of Illegal Conduct*

The record is replete with evidence that Stanley Scott, the person who initially de-

---

**2.** The Court cited: *Long v. Eastfield College,* 88 F.3d 300, 307 (5th Cir.1996) (concluding that if the innocent supervisor "did not conduct his own independent investigation, and instead merely 'rubber stamped' the recommendation of [the discriminatory supervisor], the causal link between [the employees'] protected activities and their subsequent terminations would remain intact."); *Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir.1990) ("If [the employment board] acted as the conduit of [the supervisor's] prejudice—his cat's-paw—the innocence of its members would not spare the company from liability."); *Azza-*

ro v. County of Allegheny, 110 F.3d 968, 973–74 (3rd Cir.1997) (finding evidence to support liability when a discriminating supervisor designed a plan to reorganize a department that had the effect of terminating the plaintiff which was approved by others without independent scrutiny); *Blocker v. Terrell Hills City,* 900 S.W.2d 812, 814 (Tex.App.-San Antonio 1995, writ denied) (concluding that the chain of causation was broken when the supervisor who made the adverse employment decision conducted an independent review prior to making the decision).

cided to terminate Johnson's employment, Pete Nelson, a manager in the Human Resources Department of the City who sat in on Johnson's pre-termination hearing, and many other City employees knew that Johnson had made the reports on which the court based its findings. Scott acknowledged that he knew. The record contains letters and copies of documents that show Johnson interacting with other City employees in his role of advocating for employees threatened with disciplinary measures. Copies of the July 1, 1997, termination notice that Scott sent to Johnson, referring to Johnson's position that retaliation was occurring, were sent to (1) Hugo Malanga, Director of Transportation and Public Works (Scott's supervisor), (2) Linda Nelson, Director of Human Resources, and (3) Rufino Mendoza and Pete Nelson, both in the Human Resources Department. The form notice of the disciplinary action shows that copies were sent to "Departmental and Official Personnel Files." From this evidence, the court could conclude that Johnson's reports of the various violations of law (which the trial judge found and which we unanimously uphold) were well known to City officials up the chain of command. From that the trial judge could reasonably conclude that both Scott and Terrell knew of the reports. Furthermore, the City's own records show that Johnson's position that he had been and was being retaliated against because of his actions as the employee representative was well documented.

Terrell relied on one of his assistants, Ramón Guajardo, to conduct an "investigation" when the decision of the Disciplinary Appeals Board came to him for review. Guajardo's memo to Terrell states that he reviewed the facts of the tractor-dumping incident and the findings and recommendations of the Disciplinary Appeals Board. He focused on only facts tending to support the charges; his memo to Terrell does not mention that the Board found that Scott authorized the dumping and the use of the tractor. Furthermore, he did not address Johnson's contention that his actions as the employee representative of A.C.E. was a factor in his termination, even though Johnson's personnel file contained references to his belief that he was being retaliated against as a result of those activities. Guajardo did not review Johnson's employment history with the City or whether Johnson had any prior disciplinary problems. At trial, Terrell defended the scope of the memo by saying that Guajardo investigated what he asked him to investigate. Nevertheless, Terrell had access to Johnson's personnel records and the Board's findings and recommendations, from which he could learn that Johnson's prior activity as an employee representative for A.C.E. was an issue in the disciplinary process. Regarding the limited scope of Guajardo's investigation and memo, the majority says, "Guajardo did not relay any information to Terrell that Johnson thought his termination was due to his representation of city employees." In doing so, the majority allows Terrell to insulate himself against such knowledge.

The majority accepts as true Terrell's testimony that he did not know of Johnson's actions as an employee representative for other employees. Other evidence showing that Terrell received letters indicating that Johnson acted in that capacity is dismissed by the majority as being five years old; in doing so, the majority substitutes its view of credibility for the trial judge's, who specifically made finding number twelve that Terrell knew of the reports before deciding that the appeals board's recommendation should be rejected and Johnson's termination upheld. One letter highly relevant to this inquiry is dated September 1, 1993. It was written by Johnson to Terrell, who was the City

Manager, and affirmatively states that Johnson had been acting as the employee representative for the city employees' association. It charges that other city employees had retaliated against him because of his actions as the employee representative and requests help in resolving his own and other employees' grievances. Because it is reasonable to infer that Terrell would not "forget" such a letter, the trial judge could have rejected Terrell's testimony that he did not know about Johnson's reports.

The majority's determination, based on Terrell's testimony of his lack of knowledge of the reports and failure to address Scott's knowledge, does not "detail the evidence relevant to the issue in consideration and state why it is . . . so against the great weight and preponderance of the evidence as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias." *Jaffe Aircraft Corp.*, 867 S.W.2d at 28. I would hold the evidence is factually sufficient to support the court's findings that Scott and Terrell, the "decision-makers," knew of the reports Johnson had made. This factor weighs in favor of the trial judge's finding of causation.

*Expression of a Negative Attitude Toward the Employee's Report of the Conduct*

The evidence of Pete Nelson's negative attitude toward Johnson's reports is overwhelming. Nelson was a Human Resources Department manager who had handled employee grievances for seventeen years until July of 1996. In that role he met with Johnson several times as the employee representative. He said he had "concerns" about Johnson's role and discussed them with Scott. He attended Johnson's pre-termination hearing because Scott asked him to. As the majority relates, Scott told Johnson that Nelson was upset and obsessed with "getting rid of him." Although Nelson denied animosity toward Johnson, the trial judge could reasonably infer that his view of Johnson's reports was shared by others in the City. As the majority states, Terrell acknowledged meeting with Nelson on a regular basis. Nelson said such a meeting was "atypical."

Evidence of a negative attitude toward Johnson by Scott also appears in the record. Apparently there had been reports of Johnson's making loans to other employees. By a letter dated December 3, 1996, signed by Scott and four others as the "Employee Relations Committee," Johnson was told that the committee found no evidence to support "rumors" of loans, nor that he had unfairly performed other duties as an assistant superintendent or as chairperson of the employee relations committee. It concluded by saying, "We trust that you will . . . work towards changing the perception that some people have of you." Notwithstanding that exoneration, two weeks later Scott wrote a memo to Jolly instructing him to conduct an "undercover" investigation of Johnson's on-the-job activities to ascertain if he was making loans and "doing his job as assigned." Scott wanted to know "if there are complaints from his immediate supervisor and/or employees that he supervises." Significantly, he wanted to know "if A.C.E. (Association of City Employees) business is being conducted during business hours, as well as the amount of time spent in representing A.C.E. members, etc." He requested a written report every thirty days for the next six months.[3] From all these facts, the trial judge could infer that Scott had a negative attitude toward John-

---

3. Before that period expired, Scott sent Dixson, Johnson, and Stafford the notice of "administrative leave without pay" beginning the disciplinary procedure for the tractor-dumping incident.

son that arose, at least in part, from reports he had made as the employee representative for the association. The trial judge, as judge of the credibility of the witnesses, could reasonably infer that others in the City shared this view, including Terrell.

I would find that the evidence is factually sufficient to support a finding of a negative attitude by Scott about the reports. While this factor alone cannot establish a causal connection, combined with the other factors it weighs in favor of the finding of a causal connection.

Finally under this factor, it should be noted that the supreme court said, "a *superior's* negative attitude, standing alone, would be insufficient to show a causal connection." *Zimlich*, 29 S.W.3d at 69 (emphasis added). Nelson was not Johnson's supervisor; Nelson was a manager in the Human Relations Department, the department that regularly dealt with employee disciplinary manners. In this particular instance, I would give his negative attitude toward Johnson some weight.

*Failure to Adhere to Established Policies Regarding the Employment Decision*

The evidence shows that the City had a policy of using a "disciplinary sequence" that progressed through a verbal warning, written reprimand, two steps of written reprimand coupled with a temporary reduction in pay or suspension period, probation, and termination. The policy provided that four disciplinary actions in two years was a ground for termination, and "the sequence may be modified or waived in certain circumstances by the Division head. (e.g. suspension without pay, probationary periods)." The trial judge found that the City did not follow this policy of using "progressive discipline" in punishing Johnson for the tractor-dumping incident. It is undisputed that Johnson was terminated by Scott rather than being given a verbal warning, written reprimand with or without a pay reduction or temporary suspension, or probation. Scott's July 1 letter to Johnson informing him of his termination of employment provided no justification for why the disciplinary sequence was not followed. The Disciplinary Appeals Board found that suspending the disciplinary sequence was not justified.

Without analysis of the evidence, the majority says only that it is "possible" under the policy to be terminated without prior disciplinary action. It then points out that Terrell's decision was made without knowledge of Johnson's employment history, again focusing only on what Terrell said he knew and accepting his testimony as true.

The Disciplinary Appeals Board report was addressed to Terrell. From it, he knew that the disciplinary sequence had not been followed in Johnson's case. According to Terrell, neither he nor Guajardo, upon whose "investigation" and recommendation he relied, made an effort to find out about Johnson's employment history or prior disciplinary record. Had either made an investigation, he would have found that Johnson had "above average employment evaluations" (Finding 2, which is unchallenged) and no disciplinary actions for the preceding five years (Finding 3, which is unchallenged). Nor did Terrell or Guajardo provide any basis to justify failing to follow the disciplinary sequence. Based on the record, the trial judge justifiably found that Terrell knew that the City had not imposed discipline on Johnson in the sequence that it ordinarily utilized and that no reason had been advanced for failing to do so. In holding otherwise, the majority has failed to state why the finding is "so against the great weight and preponderance of the evidence as to be manifestly unjust; why it shocks the conscience; or

clearly demonstrates bias." *Jaffe Aircraft Corp.*, 867 S.W.2d at 28.

Furthermore, the trial judge found that the City unreasonably delayed Johnson's hearing before the Disciplinary Appeals Board in retaliation for his challenging his termination and reporting that his own termination violated City policy [Finding 54]. This finding is not challenged on appeal by the City and alone supports a finding that the City did not follow its own policies in disciplining Johnson.

Even without Finding 54, the evidence shows that the City had a policy that provided for a "disciplinary sequence" and that no justification was advanced for failing to follow it in Johnson's case. The evidence is factually sufficient to support the trial judge's finding that the City failed to adhere to established policy in this employment decision. This factor weighs heavily in favor of the finding of a causal connection.

*Discriminatory Treatment in Comparison to Similarly Situated Employees*

The majority's own recitation under this factor supports the trial judge's finding. It (a) recounts the disparate treatment among various employees for the tractor-dumping incident and (b) acknowledges a conflict in the evidence regarding the extent of Scott's permission. It fails to state why the limited evidence it believes relevant to this finding "is . . . so against the great weight and preponderance of the evidence as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias." *Id.*

In connection with the tractor-dumping incident, the trial judge found: (a) Stanley Scott, who was head of Johnson's department, authorized use of the tractor on property owned by Stafford, who was a foreman in Johnson's department (Finding 27), (b) Scott knew of and authorized the dumping on Stafford's property (Finding

44), (c) Scott gave permission to Jolly, assistant head of Johnson's department, to allow the dumping (sign the dump permit) on Stafford's property (Finding 32), (d) Stafford, Jolly, and Dixson were terminated for the dumping (Finding 32), (e) Scott was not disciplined for authorizing use of the tractor on Stafford's property (Finding 28), (f) Jolly was reinstated with back pay after being terminated for the incident. Only one of these findings—that Scott authorized use of the tractor—is challenged by the City. Evidence on that finding was contested, with Stafford, Johnson, and Dixson saying Scott approved and Scott denying it. The trial judge's finding on that point, based on a credibility determination, should be upheld. Furthermore, Scott was the decision-maker who initially applied discipline in a discriminatory manner—some were terminated, others were not disciplined at all for essentially the same conduct.

The Disciplinary Appeals Board report was addressed to Terrell. From it, he knew that different employees had been treated differently based on the same incident. He knew Jolly had been reinstated; he knew that Scott had not been disciplined at all; he knew that others were involved in dumping materials who were not disciplined. As the Disciplinary Appeals Board said: "It is not reasonable to discipline individuals who asked for . . . . permission unless the individual who granted it is also disciplined."

The Board recommended that Terrell reverse the decision to terminate the employment of Dixson, Johnson, and Stafford, and pay them back wages and benefits. Terrell reversed the decision as to Dixson, who was reinstated, but not as to Johnson and Stafford, whose terminations were upheld. Johnson thus received discriminatory treatment in comparison to similarly situated employees: Scott, who authorized

the dumping and tractor-use, was not disciplined; Stafford, whose culpability was greater than Johnson's because it was his land, received the same discipline as Johnson; Jolly, who signed the permit, was reinstated with back pay; Dixson, who hauled material to Stafford's property, was ultimately reinstated with back pay; other employees who delivered materials to Stafford's property were not disciplined.

Terrell, as City Manager, either knew of or a reasonable investigation by him would have revealed these disparities in treatment among the various employees. I would find the evidence factually sufficient to support the trial judge's finding that Johnson received discriminatory treatment arising out of the tractor-dumping incident. This factor weighs heavily in favor of the finding of a causal connection.

*Evidence that the Stated Reasons for the Adverse Employment Action are False*

In Finding 47 the trial judge found that the stated reasons for termination are false. As the Disciplinary Appeals Board found, material was dumped on Stafford's property and a City-owned tractor used there. But that should not end the inquiry because both actions, under City policy, could be proper as far as Johnson's involvement was concerned.

A review of factual sufficiency of this finding requires no analysis other than a consideration of the disputed evidence regarding whether Scott authorized the use of the tractor and the dumping. Scott testified that he did not. Stafford, Johnson, and Dixson testified he did. The trial judge resolved the credibility issue and found that Scott authorized use of the tractor (Finding 27) and gave permission for City employees to dump rough material on Stafford's property (Finding 32). As the Board noted, the "impossible-to-ignore" tape recording leads to a conclusion that Scott gave his permission, "in spite of

his denials." Here again, the majority does not "detail the evidence relevant to the issue in consideration and state why [the finding] is ... so against the great weight and preponderance of the evidence as to be manifestly unjust; why it shocks the conscience; or clearly demonstrates bias." *Id.* In holding that the evidence is factually insufficient to support this finding, the majority has again substituted its credibility determination for that of the factfinder. *Maritime Overseas Corp.,* 971 S.W.2d at 407. Because factually-sufficient evidence exists that Johnson's activities on Stafford's property were authorized by Scott, I would sustain the trial judge's finding that the stated reasons for Johnson's discipline were false. This finding weighs in favor of the finding of a causal connection.

## CONCLUSION

I believe that the majority has re-assessed the credibility of the witnesses and substituted its judgment for that of the factfinder, in violation of the Supreme Court's admonition. *Id.* I further believe that the majority has failed to consider all the relevant evidence in its factual-sufficiency review. *Checker Bag,* 27 S.W.3d at 633. Finally, because of these deficiencies, the majority has failed to state reasons why the evidence is factually insufficient to support the trial judge's findings. *Jaffe Aircraft Corp.,* 867 S.W.2d at 28.

I would hold that the evidence is factually sufficient to support each of the trial judge's findings regarding the *Zimlich* factors and, in turn, sufficient to support the finding that a causal connection existed between Johnson's good faith reports of violations of law by the City of Fort Worth and the City's termination of his employment. *Zimlich,* 29 S.W.3d at 69. Because

**182**

the majority holds otherwise, I respectfully dissent.